NATIONAL PARKS AND CONSERVA-
TION ASSOCIATION, Southern Utah
Wilderness Alliance; Sierra Club; Debo-
rah L. Threedy, Petitioners,

v.

FEDERAL AVIATION ADMINISTRA-
TION, Department of Transporta-
tion, Respondents.

NATIONAL PARKS AND CONSERVA-
TION ASSOCIATION, Southern Utah
Wilderness Alliance, Sierra Club, Debo-
rah L. Threedy, Petitioners,

v.

FEDERAL AVIATION ADMINISTRA-
TION, Department of Transportation,
Bureau of Land Management, United
States Department of the Interior, Re-
spondents.

San Juan County Board of
Commissioners, Real
Party in Interest.

Nos. 90–9564, 90–9576 and 91–9513.

United States Court of Appeals,
Tenth Circuit.

July 7, 1993.

William J. Lockhart, Salt Lake City, UT, for petitioners.

John A. Bryson (Peter R. Steenland, Jr. and Barry M. Hartman, Acting Asst. Atty. Gen., Dept. of Justice, Washington, DC, Karl B. Lewis, Office of Asst. Chief Counsel, Northwest Mountain Region, Federal Aviation Admin., Renton, WA, and David K. Grayson, Regional Sol., U.S. Dept. of Interior, Salt Lake City, UT, with him, on the briefs), for respondents.

Before LOGAN, BARRETT and SEYMOUR, Circuit Judges.

SEYMOUR, Circuit Judge.

This appeal arises from the construction of an airport at Halls Crossing in San Juan County, Utah. In No. 90–9564, petitioners seek review of an order of the Federal Aviation Administration (FAA) approving the construction, operation, and funding of the airport.[1] In No. 91–9513, petitioners seek review of actions of the Bureau of Land Management (BLM) approving an amendment of a land plan which allowed disposal by patent of BLM public land in San Juan County for use by the airport.[2] We reverse.[3]

## I.

The airport is located adjacent to the boundary of Glen Canyon National Recreation Area (GCNRA), a unit of the National Park System. Planning for the airport began due to concerns of the National Park Service (NPS) regarding the safety of the existing dirt airstrip. San Juan County sought to sponsor an airport and requested FAA approval and funding.

In accordance with requirements of the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 et seq., the FAA prepared an environmental impact statement (EIS) in cooperation with the NPS and the BLM. The BLM administers the various public lands which were considered as sites for the airport. In the EIS, the FAA analyzed its obligations under section 4(f) of the Transportation Act,[4] section 2208 of the Airport and Airways Improvement Act (AAIA),[5] and section 308 of the Federal Aviation Act (FAA Act).[6] Two of the potential sites for the airport were located on public lands administered by the BLM pursuant to the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. §§ 1701 et seq. (1986). A portion of the site finally selected was located on land that had been designated an "area of critical environmental concern" (ACEC) under sections 1702(a) and 1712(c) of FLPMA by a 1989 Proposed Resource Management Plan (RMP).[7] The BLM also governed the sites according to the 1973 Management Framework Plan.[8] The RMP, when final-

---

1. In No. 90–9576, petitioners filed an identical petition for review in the D.C. Circuit, which was transferred to this court and consolidated with No. 90–9564.

2. Review of the BLM action was sought in the District Court of Utah under the Administrative Procedure Act, 5 U.S.C. §§ 701–706 (1988), and the general federal question jurisdiction grant of 28 U.S.C. § 1331. The District Court ordered the claims transferred to our court pursuant to 28 U.S.C. § 1631 (1988) (transfer to cure want of jurisdiction).

3. On April 3, 1991, this court denied petitioners' request for a stay of the construction of the airport, which has since been completed. Both parties stated at oral argument that this does not moot the case, however, because the land could be reconveyed to the BLM or certain restrictions could be placed on the use of the airport.

4. The Secretary may approve a transportation program or project ... requiring the use of publicly owned land of a public park, recreation area ... only if—(1) there is no prudent and feasible alternative to using that land; and (2) the program or project includes all possible planning to minimize harm to the park, recreation area, wildlife and waterfowl refuge, or historic site resulting from the use.
 49 U.S.C. § 303(c) (1988) (hereinafter "section 4(f)").

5. It is declared to be national policy that airport development projects authorized pursuant to

this chapter shall provide for the protection and enhancement of the natural resources and the quality of the environment of the Nation. In implementing this policy, the Secretary ... shall authorize no such project found to have significant adverse effect unless the Secretary shall render a finding, in writing, following a full and complete review ... that no feasible and prudent alternative exists and that all reasonable steps have been taken to minimize such adverse effect.
 49 U.S.C.App. § 2208(b)(5) (1988) (hereinafter "section 2208").

6. "No Federal funds ... shall be expended ... except upon the written recommendation ... that such landing area or facility is reasonably necessary for use in air commerce or in the interests of national defense." 49 U.S.C.App. § 1349(a) (1988) (hereinafter "section 308").

7. "To guide the use of [public domain lands], and to provide wise management of the public's natural resources, BLM develops land-use plans. These plans provide an agreement between the government and the citizens on how the public lands and resources will be managed, allocated, and used." Foreword, San Juan Proposed Resource Management Plan (April 1989), Rec. (No. 91–9513), supp. vol. I (hereinafter 1989 RMP).

8. A Management Framework Plan provides step-by-step instructions as to the management of a particular public land resource area. Each indi-

ized, would have required scenic protection for corridors on both sides of Utah Highway U–276, which subsequently included the airport site. The 1989 RMP nominated the area for protection as the Scenic Highway Corridor ACEC. Therefore, in order to permit conveyance, the BLM had to amend the land plan, which required compliance with NEPA.

The FAA issued the draft EIS (hereinafter DEIS) on January 17, 1990. On the same day, the BLM gave notice of its intention to amend the 1973 Management Plan. The notice stated that the BLM would rely on the FAA's EIS as the basis for compliance with NEPA. The final EIS (hereinafter FEIS) was issued in May 1990. The Record of Decision approving the airport and conveying the land was issued in August 1990. In deciding to fund the airport, the FAA determined there would be no significant impacts on the recreational experience of visitors at the Glen Canyon recreation area. To reach this decision, the FAA considered the impact of the airport on several aspects of the recreation area and its visitors. One of the main concerns was the impact of airplane noise. The FAA undertook a noise impact analysis and determined that there would be no significant impact on the visitors. The finding of no significant impact led the FAA to determine the airport would not "use" the resources of the area, thereby not triggering the requirements of section 4(f) of the Transportation Act.[9]

Petitioners contend the FAA incorrectly determined that the noise impact of the airport would have "no significant impact" on the surrounding environment. They specifically assert that the FAA ignored relevant studies on noise impact including one prepared by the NPS, and that the FAA failed

to consider relevant factors in determining the noise impacts. Petitioners also contend that the BLM failed to give the required notice of the land plan amendment and of its intent to change the designation of the Scenic Highway Corridor, and failed to comply with its duties under FLMPA by not providing a rational assessment of the effect of the conveyance on the existing land plans. Finally, petitioners argue that the BLM's reversal of its position with respect to the Scenic Corridor ACEC constitutes arbitrary and capricious action.

Respondents dispute each of petitioners' contentions. They argue that the noise impact analysis considered all relevant factors under the methodology chosen by the FAA, and that the EIS is sufficient in meeting the BLM's requirements under FLMPA. They also assert that the 1989 RMP was only a proposal and therefore the change in designation of the land was not arbitrary and capricious action.

## II.

## JURISDICTION

We must first determine whether jurisdiction to review petitioners' claims rests with this court, the district court, or both courts. As we have noted, the action petitioners filed in district court was transferred to this court after the district court held it lacked subject matter jurisdiction.

### A. The FAA Decision

 The FAA Act in section 1006(a) vests exclusive jurisdiction in the Courts of Appeals for review of "any order … issued by the Board or Administrator under this Act." Act of Aug. 23, 1958, 72 Stat. 795.[10] Petition-

---

vidual management decision (i.e., to remove livestock during the summer) is listed along with the action required to achieve the decision and the supporting rationale.

9. Both the Environmental Protection Agency (EPA) and the Department of Interior (DOI) objected to the FAA's conclusions. The EPA specifically objected to the use of voluntary mitigation measures and stated "the FAA should develop specific noise monitoring … [and] require the airport sponsor to provide adequate long-term monitoring of noise sensitive recreational areas

to assess the change in the ambient noise environment." Rec. (No. 90–9564), supp. vol. V, doc. 21, at 2. The DOI also suggested stricter mitigation requirements and objected to the failure of the FAA to utilize the noise audibility information provided by the NPS. Rec. (No. 90–9564), supp. vol. VI, doc. 17 at # 448.

10. The Federal Aviation Act was partially revised in 1978. The unrevised portion is designated as Title 49 Appendix. Petitioners argue that the original version of the Aviation Act provided for jurisdiction of orders issued "under this Act,"

ers argue that their claims do not challenge action taken under the FAA Act but rather actions taken under the AAIA, section 4(f), NEPA, the National Park Service Organic Act, 16 U.S.C. § 1 (1992), and the Airports In and Near National Parks Act, 16 U.S.C. § 7a (1992).[11] They further contend that the actions of the BLM were clearly not taken under the FAA Act. Respondents assert that all of the actions challenged took place pursuant to the basic determination to fund the airport as set forth in the FAA's Record of Decision. As required by section 308 of the FAA Act, the Secretary must determine that the airport is "reasonably necessary" for use in air commerce before funds are approved. Respondents also contend that the BLM actions were taken in response to a request by the FAA to convey the land and are therefore part of the overall FAA airport authorization process.

■ In considering our jurisdiction over the challenged FAA actions, we first note some basic propositions.

[W]hen two jurisdictional statutes draw different routes of appeal, the well-established rule is to apply only the more specific legislation. *See* 1A C. Sands, *Statutes and Statutory Construction* § 23.16 (4th ed. 1972). "[T]he rule that a precisely drawn, detailed statute preempts more general remedies" flows from the Congressional intent to carve out from the broader scheme a specific exception for this particular type of claim. *Block v. North Dakota, ex rel. Bd. of Univ. and School Lands,* 461 U.S. 273, 285, 103 S.Ct. 1811, 1818, 75 L.Ed.2d 840 (1983).

while the revised version uses the phrase "under this chapter." Petitioners contend this change has no legal effect. The jurisdiction is listed in 49 U.S.C.App. § 1486(a) and made exclusive in § 1486(d). Thus, the relevant cases often discuss section 1486, as opposed to section 1006, as do petitioners.

**11.** Petitioners originally requested review of the FAA's determination under the FAA Act that the airport was reasonably necessary for use in air commerce. In their memorandum addressing the jurisdictional issues, petitioners stated that "no claim will challenge that 'finding.'" Petitioners' Memorandum on Jurisdictional Issues at

*California Save Our Streams Council v. Yeutter,* 887 F.2d 908, 911 (9th Cir.1989). Chapter 20 of the Transportation Act created the FAA. 49 U.S.C. § 1341(a). The jurisdictional provision in section 1006 of the FAA Act is also found in Chapter 20 of the Transportation Act. This is of some significance as "[s]tatutory review in the agency's specially designated forum prevails over general federal question jurisdiction in the district courts." *Media Access Project v. F.C.C.,* 883 F.2d 1063, 1067 (D.C.Cir.1989). *See also City of Rochester v. Bond,* 603 F.2d 927, 931 (D.C.Cir.1979); *General Elec. Uranium Management Corp. v. Dep't of Energy,* 764 F.2d 896, 903 (D.C.Cir.1985) ("'where it is unclear whether review jurisdiction is in the district court or the court of appeals the ambiguity is resolved in favor of the latter'") (quoting *Denberg v. United States R.R. Retirement Bd.,* 696 F.2d 1193, 1197 (7th Cir. 1983), *cert. denied,* 466 U.S. 926, 104 S.Ct. 1706, 80 L.Ed.2d 180 (1984)); *Connors v. Amax Coal Co.,* 858 F.2d 1226, 1231 (7th Cir.1988) ("Generally, when jurisdiction to review administrative determinations is vested in the courts of appeals these specific, exclusive jurisdiction provisions preempt district court jurisdiction over related issues under other statutes."). Moreover, in determining which orders fall under the FAA Act, the term "order" should be construed broadly. *State of New York v. F.A.A.,* 712 F.2d 806, 808 (2d Cir.1983).

As the court in *Media Access Project* noted, other courts have addressed the issue of which FAA decisions encompass an "order" under the FAA Act and therefore receive direct review in the appellate courts.[12]

**9.** Petitioners therefore argue that there are no challenged actions taken under the FAA Act.

**12.** Petitioners contend that this court has limited the reach of ancillary jurisdiction in FAA cases. *City of Aurora v. Hunt,* 749 F.2d 1457 (10th Cir.1984). We do not believe that decision is on point. First, the reach of section 1006 of the FAA Act was not raised. Second, our decision in *City of Aurora* rested upon two grounds: no independent jurisdictional basis and a failure by the City to comply with procedural requirements. Finally, the challenged action in *City of Aurora* was the formation of a committee, not the final action of the committee.

[C]ourts [have] found that decisions of the [FAA] to proceed with certain plans without requiring environmental impact statements were made pursuant to the agency's organic statute ... and not under [NEPA].... Thus, the district courts did not have jurisdiction over challenges to the FAA's action as inconsistent with NEPA; rather, the court of appeals' jurisdiction was exclusive.

*Media Access Project,* 883 F.2d at 1067 (citing *City of Rochester,* 603 F.2d at 936; *City of Alexandria v. Helms,* 728 F.2d 643, 645 n. 2 (4th Cir.1984); *Suburban O'Hare Comm'n v. Dole,* 787 F.2d 186, 192–193 (7th Cir.), *cert. denied,* 479 U.S. 847, 107 S.Ct. 169, 93 L.Ed.2d 106 (1986)).

Moreover, we note that NEPA does not provide independent grounds for district court jurisdiction. "[W]hen review of an agency order is at issue and when Congress has vested exclusive jurisdiction over that review in the Courts of Appeals, NEPA does not provide independent grounds for district court jurisdiction." *Helms,* 728 F.2d at 646 (footnote omitted).

While factually different in that the FAA here did prepare an EIS, we believe the above reasoning applies to the case before us. The determinations regarding the environmental impact of the airport were necessary to the FAA's decision to fund the proposed airport. While these determinations were made under statutes other than the FAA Act, all were taken under the FAA's organic statute and in regard to the FAA's basic mission: the regulation of the nation's air transport system. We therefore conclude that we have jurisdiction to review the challenged FAA actions.

## B. The BLM Decision

■ Somewhat more difficult to determine is whether we have jurisdiction over the challenged actions of the BLM. Under the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.* (1988), and the general grant of federal question jurisdiction, 28 U.S.C. § 1331, review of BLM decisions generally rests in the district courts. In order to find appellate jurisdiction in this case, we must determine that the actions of the BLM were taken to

facilitate the actions of the FAA, and that such facilitation places the BLM's actions under our jurisdiction. Pursuant to section 516 of the AAIA Act, 49 U.S.C.App. § 2215(b), the Secretary of the FAA requested the BLM to convey the land for the airport as "reasonably necessary" to the airport project.

Upon receipt of a request from the Secretary ... the head of the [BLM] shall determine whether the requested conveyance is inconsistent with the needs of the [BLM].... If the [BLM] determines that the requested conveyance is not inconsistent with the needs of the [BLM], the [BLM] is hereby authorized and directed ... to perform any acts and to execute any instruments necessary to make the conveyance requested.

*Id.* Thus, while the BLM's decision to convey the land focused on statutes separate from the FAA Act, the BLM's decision-making process was initiated by the provisions of the FAA Act. Contrary to petitioners' argument, the BLM was required to consider the request, at the very least to determine if the project was inconsistent with the needs of the BLM. *See id.* ("the head of the [BLM] *shall* determine....") (emphasis added). Moreover, if the BLM had determined that the land could not be conveyed, the FAA's project would not have been able to proceed on that land.

The issue of whether a jurisdictional grant to review one agency's actions reaches another agency's actions was addressed in *California Save Our Streams Council,* 887 F.2d 908. In that case, the Ninth Circuit considered the reach of jurisdiction of the appellate courts under the Federal Power Act, 16 U.S.C. §§ 792 *et seq.* (1992). The Federal Energy Regulatory Commission (FERC) proposed to issue a license for a power facility on land managed by the Forest Service. As required by its governing regulations, FERC solicited conditions to be imposed on the use of the land from the Forest Service. The Forest Service imposed fourteen conditions on the proposed license, and FERC issued the license. The Council brought suit against the Forest Service, alleging a failure to follow

procedures outlined in statutes separate from the Federal Power Act.

The Ninth Circuit determined that under the Federal Power Act, exclusive jurisdiction to review rested with the courts of appeals. In making this determination, the court stated "the practical effect of the action in district court is an assault on an important ingredient of the FERC license." *Id.* at 912. The court also noted the possibility for duplicative suits if the action against the Forest Service was allowed to proceed in district court. "The point of creating a special review procedure in the first place is to avoid duplication and inconsistency.... Appellants' theory would resurrect the very problems that Congress sought to eliminate." *Id.*

The same issues arise here. The challenge to the BLM centers on the effect of the airport on the surrounding area. Without, the construction of the airport, the BLM's actions would be meaningless. Moreover, if the BLM actions could not be directly reviewed by us while the FAA actions could, the bifurcated suit could result in inconsistency, duplication, and delay. Finally, we note "[i]f there is any ambiguity as to whether jurisdiction lies with a district court or with a court of appeals we must resolve that ambiguity in favor of review by a court of appeals." *Suburban O'Hare Comm'n,* 787 F.2d at 192. Given the statutory scheme in which the actions of the BLM arose and the analysis discussed above, we conclude that we do have jurisdiction to review the actions of the BLM.

Petitioners suggest a finding of jurisdiction would lessen the importance attached to the BLM and the policies of FLPMA by treating them as subsidiary to the FAA. Such a characterization is unsound. In determining that the actions of the BLM were made at the request of and as part of the FAA's planning process, we do not disregard the mission of the BLM and the important policies of FLPMA, which we hold in the highest regard.

**13.** Petitioners raise other issues concerning the BLM's actions. In light of our decision, howev-

### III.

### ACTIONS OF THE BLM

As described above, the airport site is located on public land administered by the BLM pursuant to section 202 of FLPMA, 43 U.S.C. § 1712. The site was managed under the 1973 Management Framework Plan, which, respondents agree, did not authorize disposal of the site. Resp.Br. at 20. The proposed 1989 RMP also contained a ban on transfer of federal ownership of the land: "Scenic Highway Corridor ACEC would be ... retained in public ownership and not classified, segregated or withdrawn from entry." Rec. (No. 91–9513), supp. vol. I, at 67–68. Further, the RMP specifically "exclud[ed] surface disturbance to protect ... Scenic Highway Corridor ACEC." *Id.* at 12. Thus, under either the existing or the proposed RMP, a plan amendment had to be effected before the land could be transferred from the BLM.

Petitioners contend the BLM's actions violated the notice requirements of FLPMA, which mandate public participation from the beginning of the planning process.[13] The statute clearly states that "[t]he Secretary shall *with public involvement* and consistent with the terms and conditions of this Act, develop, maintain, and, when appropriate, revise land use plans which provide by tracts or areas for the use of the public lands." 43 U.S.C. § 1712(a) (emphasis added). The FAA claims sufficient notice of the plan amendment was given in the scoping notice, which listed "U–95 Scenic Corridor Restrictions" as a scoping issue. Rec. (No. 90–9564), supp. vol. III, doc. 15 at F5 (hereinafter FEIS).

The governing regulations of the BLM as promulgated under FLPMA provide that an amendment "shall be made through an environmental assessment of the proposed change, or an environmental impact statement, if necessary, [and] public involvement as prescribed in § 1610.2." 43 CFR § 1610.5–5 (1991). Under section 1610.2, the public "shall be provided opportunities to

er, we need not address those arguments.

*meaningfully participate in and comment on* the preparation of plans, amendments and related guidance *and be given early notice of planning activities.*" *Id.* § 1610.2(a) (emphasis added).

Public notice and opportunity for participation in resource management plan preparation shall be appropriate to the areas and people involved and shall be provided at the following specific points in the planning process:

(1) General notice at the outset of the process inviting participation in the identification of issues. (See §§ 1610.2(c) and 1610.4–1);

(2) Review of the proposed planning criteria (See § 1610.4–2);

(3) Publication · of the draft resource management plan and draft environmental impact statement (See § 1610.4–7);

(4) Publication of the proposed resource management plan and final environmental impact statement which triggers the opportunity for protest (See §§ 1610.4–8 and 1610.5–1(b)); and

(5) Public notice and comment on any significant change made to the plan as a result of action on a protest (See § 1610.5–1(b)).

*Id.* § 1610.2(f) (1)–(5).

The regulations specifically describe the public participation required from the very beginning of the process.

At the outset of the planning process, the public, other Federal agencies, State and local governments and Indian tribes shall be given an opportunity to suggest concerns, needs, and resource use, development, and protection opportunities for consideration in the preparation of the resource management plan.

*Id.* at § 1610.4–1.

A brief chronology of the actions of both agencies is helpful in determining whether the BLM met the notice requirements. In September 1987, the BLM issued a proposed RMP for the disputed area.[14] Rec. (No. 91–9513), supp. vol. I, at i. This RMP contained a ban on the transfer of the land: the "Scenic

Highway Corridor ACEC would be . . . retained in public ownership." Rec. (No. 91–9513), supp. vol. I, at 67–68. On December 17, 1987, the FAA issued its scoping packet with the "U–95 Scenic Corridor Restrictions" as an issue. FEIS at F1–F4. No mention was made of any specific "restrictions" contemplated. The scoping packet referred to three possible sites for the airport, *id.* at F5, none of which was in the U–95 Scenic Corridor. Following the scoping packet, the FAA engaged in a site selection study during 1988 and 1989. From that study, the current airport site was chosen. The record does not establish that the study was made public.

Significantly, during this same time, the BLM continued to move forward on the proposed RMP. In April 1989, the BLM reissued the proposed RMP *with the ban on transfer of federal land still included.* Rec. (No. 91–9513), supp. vol. I, at i. Thus, as far as the public was or could have been aware, the BLM intended to protect the area which the FAA had *privately* identified as a possible site for the airport. In fact, the BLM and the FAA were discussing the proposed airport at Halls Crossing. For example, the very same month that the 1989 RMP was reissued, the Secretary of the Interior sent a letter to the Governor of Utah expressing his "understanding that an alternative [airport] site on public lands has been identified. If using public lands outside the Recreation Are [sic] is a viable alternative, BLM would be happy to work with you to make the lands available." Rec. (No. 91–9513), vol. II, doc. 104. *See also* "Chronology of Halls Crossing Patent," Rec. (No. 91–9513), vol. I, doc. 4 (listing the numerous letters between the FAA and the BLM after the re-release of the RMP and before the notice of plan amendment). Then, on January 17, 1990, the FAA issued the DEIS with the final airport site *identified for the first time.* Rec. (No. 90–9564), supp. vol. II, doc. 11. On the same day, the BLM issued a notice of plan amendment. Rec. (No. 90–9564), supp. vol. I, doc. 10. The draft EIS also stated "the analysis · in this EIS constitutes NEPA analysis for the Plan Amendment." DEIS at 2.31. The DEIS was the first notice to the public that

---

14. Due to the large number of comments on this RMP, it was later treated as a draft.

not only was the proposed RMP banning the transfer of land not moving forward, but the BLM actually intended to transfer the land.

The FAA's argument that the scoping notice provided sufficient notice of the plan amendment is completely unpersuasive. At the time of the issuance of the scoping packet in 1987, neither BLM site subsequently specified in the DEIS and the FEIS had yet been identified. *See* FEIS at F1–F4. Consequently, the FAA's argument that a mention in 1987 of "U–95 scenic corridor restrictions" with no further specifics is equivalent to notice of the necessity for a plan amendment is specious.

The FAA argues that petitioners received actual notice of the intended plan amendment through the scoping notice and the DEIS. We have already demonstrated that the scoping notice did *not* provide the requisite notice. Moreover, even assuming that the DEIS provided sufficient notice and recognizing that petitioners did have the opportunity to comment on the DEIS, the BLM still violated its own regulations. Notice is required to be provided at the "onset of the planning process." 43 CFR § 1610.4–1. It is clear that discussion of a transfer of land had begun months prior to the issuance of DEIS and the DEIS was thus not the beginning of the planning process.

Congress, through FLPMA and NEPA, has determined that the public has a right to participate in actions affecting public lands. As the record in this case clearly reflects, actions such as this one, involving more than one federal agency and various federal environmental laws, contain serious potential for confusion, especially for the public. Under the specific requirements of NEPA and FLPMA, the BLM was required to provide petitioners and the public with clear notice of its actions so that the statutory participation could take place. It is' apparent from the chronology set forth above that the notice given was far from adequate. We therefore hold that the notice requirements to amend the plan and transfer the land were not met.

## IV.

### ACTIONS OF THE FAA

■ Petitioners also assert that the actions of the FAA violate section 4(f) of the Transportation Act and section 2208 of the AAIA. At the crux of their argument is the FAA's determinations that the airport would have "no significant impact" and "no significant adverse effect" on the visitors or recreational use of the Glen Canyon area. Petitioners contend the FAA applied an unlawful standard in making these determinations.[15] The FAA argues in response that the agency adequately utilized a lawful standard.

■ Obligations under section 4(f) arise if the project makes "use" of publicly owned land. 49 U.S.C. § 303(c). The term "use" is construed broadly and is "not limited to the concept of a physical taking, but includes areas that are significantly, adversely affected by the project." *Adler v. Lewis*, 675 F.2d 1085, 1092 (9th Cir.1982). "No 'use' will be deemed to have occurred where an action will have only an insignificant effect on the existing use of protected lands." *Allison v. Dep't of Transp.*, 908 F.2d 1024, 1028 (D.C.Cir.1990). The relevant inquiry is therefore whether the project would have a "significant" impact on the lands. This inquiry is almost identical to the analysis necessary under section 2208, whereby the Secretary must determine if the project will have a "significant, adverse impact." If a finding of significance is made under either section, the Secretary can only approve the project if there are no feasible, prudent alternatives and all reasonable steps have been taken to minimize the harm or the adverse effect. *Compare* 49 U.S.C. § 303(c) *with* 49 U.S.C.App. § 2208(b)(5).

"The determining factors as to whether the impacts are significant are the threshold levels defined in FAA Order 5050.4a." FEIS at 4.1. This FAA document "provides instructions and guidance for preparing and processing ... environmental impact statements [ ] for airport development proposals." *Airport Environmental Handbook*, FAA Order 5050.4a at 1 (Oct. 8, 1985), Department of Transportation, Federal Aviation Administra-

---

**15.** Given our decision on this issue, we need not address petitioners' other contentions.

tion. In turn, Order 5050.4a references the Federal Aviation Regulations, 14 CFR Pt. 150, App. A. Appendix A is a Land Use Compatibility chart which lists land uses and the noise levels considered compatible with each use as measured under the Ldn methodology. The FEIS contains a copy of this chart in its appendix. FEIS 'at App. 4.

 We review the FAA's determination of no significant impact and the decision to fund the airport under the arbitrary and capricious standard. *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 34, 103 S.Ct. 2856, 2862, 77 L.Ed.2d 443 (1983); *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 414, 91 S.Ct. 814, 822, 28 L.Ed.2d 136 (1971). While our inquiry must be "searching and careful," we must uphold the agency if there is a rational basis for its opinion. *Thomas Brooks Chartered v. Burnett,* 920 F.2d 634, 643 (10th Cir.1990). "All the agency need do is demonstrate it considered relevant factors and alternatives after a full ventilation of the issues, and that the choice it made was reasonable based on those considerations." *Id.* We review the factual findings underlying the no significant impact determination under the substantial evidence standard. *See* 49 U.S.C.App. § 1486(e).

As mentioned above, the FEIS stated that the threshold levels to determine significance were those listed under the Land Use Compatibility chart which made use of the Ldn methodology. However, in evaluating the impacts of overflights on visitors to Glen Canyon, "the agency did not use the Ldn methodology typically employed to analyze potential impacts near the proposed airport sites because that methodology 'is uniquely suited to assess ... noise impact in the immediate airport environs'.[sic]" Resp.Br. at 8 (quoting FEIS at 9.29). Instead, the FAA attempted to assess the pre-airport noise environment and project the post-airport noise environment based on an audibility standard.

The FEIS does not list any new threshold levels based on audibility. Thus, it is unclear what the FAA considered the threshold for significance.

It is clear, however, that the FAA believed the airport would double the current level of aircraft audibility. To determine the actual impact of the airport on the noise environment, the FAA estimated the number of aircraft operations for the years 1997 and 2007 if the airport were built and if the airport were not built. FEIS at 4.36–4.37. Under the FAA's own estimates, by the year 2007, the number of aircraft would at least double with the construction of the airport.[16]

Because the number of aircraft would double, the amount of time a visitor would experience audible aircraft would also double. The FAA recognized that, "the duration of audibility of aircraft utilizing Halls Crossing Airport may also double under the Development Alternative." FEIS at 4.41. The FEIS described the pre-airport noise environment as one in which a visitor may experience 8–20 minutes of aircraft noise, *id.* at 4.39, and recognized that a backcountry user may experience "15 to 25 *additional* minutes (over the No Action Alternative) of audible general aviation aircraft per busy summer day," *id.* (emphasis added).

Thus, the FAA determined that both the *number of aircraft and the level of audibility* would double. In determining the significance of this increase, the FAA stated that such a determination is "subjective as the degree of impact is dependent upon the recipient's attitude and sensitivity, as well as objective measures of sound ..." FEIS at 4.34. While the FAA recognized that "[n]ot much research has been conducted on noise impacts to recreational users," *id.* at 4.42, the FEIS assumed that "audible aircraft would likely detract from the visitor's experience," *id.* at 4.41. The FEIS discusses a survey conducted for the Jackson Hole, Wyoming airport in which none of the participants

---

**16.** The National Park Service undertook a noise monitoring program at Glen Canyon National Recreation Area. The study focused on "detectable" noise and used "audibility ... as the primary noise descripter." Rec. (No. 90–9564), supp. vol. I, doc. 8. The report based the pre-airport noise atmosphere on measurements taken

from a neighboring national park. The NPS determined that the proposed airport site would double the noise impacts from the pre-airport noise atmosphere. The FAA dismissed the report as "highly theoretical" and not "relate[d] to actual conditions at the proposed airport site." FEIS at 9.28.

mentioned aircraft noise annoyance as an irritating or bothersome condition. *Id.* However, no comparison is made of the Jackson Hole airport and the proposed Halls Crossing airport. The FEIS itself describes the limited value of the Jackson Hole study: "[o]ther surveys would likely reveal different values and attitudes." *Id.*

■■■ Despite the absence of any evidence describing the impact of aircraft noise on visitors' recreational experiences and the FAA's recognition that this determination is subjective, the FAA determined the airport would have no significant impact on the recreational use of the area. *Id.* The FAA provided *no* empirical evidence to support this claim, which appears to contradict other findings in the FEIS. The FAA has substituted its subjective evaluation for that of recreational users instead of attempting to ascertain the actual impact on the users themselves. Given these circumstances, we cannot say that agency action was "rational" or "reasonable" in determining that the airport would have no significant impact from a noise standpoint on the surrounding recreational environment. *See Thomas Brooks Chartered,* 920 F.2d at 643 (applying rational basis test). The FAA argues that the finding of "no significant impact" is a technical issue which is committed to the agency's judgment. The FAA further contends that there is no acceptable methodology to measure noise impacts on visitors' recreational experience, so the analysis undertaken was necessarily subjective and inexact. Resp.Br. at 13, 14 and 27. While we agree that we owe deference to agency determinations in an area where the agency has expertise, *City of Aurora,* 749 F.2d at 1462, we need not defer to irrational judgments. The FAA explicitly rejected the Ldn methodology and performed the noise impact analysis based on various assumptions and subjective values which did not provide us with a "rational" decision that we could assess.

The cases cited by the FAA do not require that we hold otherwise. *See Communities, Inc. v. Busey,* 956 F.2d 619, 624 (6th Cir.

1992) (deferring to FAA's use of Ldn methodology to measure noise impact); *Citizens Against Burlington v. Busey,* 938 F.2d 190, 201 (D.C.Cir.1991) (deferring to FAA's use of Ldn and single event methodology to measure noise impacts where "FAA proceeded to mold a body of data, dissect it, and display it in comprehensible forms."); *Sierra Club v. U.S. Dep't of Transp.,* 753 F.2d 120, 129 (D.C.Cir.1985) (deferring to agency's use of Ldn methodology and stating that "[t]he court's responsibility lies in assuring that the agency had before it all the data to make an informed decision that adequately took account of the important environmental concerns.").

For the reasons set out above, we must conclude that the action of the FAA approving the airport project based on a finding of "no significant impact" and "no significant adverse affect" is arbitrary and capricious.

### V.

"When an agency relies on a number of findings, one or more of which are erroneous, we must reverse and remand only when there is a significant chance that but for the errors the agency might have reached a different result." *Salt River Project Agric. Improvement & Power Dist. v. United States,* 762 F.2d 1053, 1060–61 n. 8 (D.C.Cir.1985). It is unclear here whether the BLM would have reached the same decision if active involvement by the public was present from the beginning of the process. We therefore REVERSE the BLM's plan amendment and the transfer of land. We REMAND for further proceedings to determine whether the land should be retained under BLM control and management or reconveyed to San Juan County under a newly proposed land use plan amendment. In the case of the FAA, the airport has already been built. This does not mean that a remand would be meaningless, however. On remand, the FAA should re-analyze the impact of the airport under section 4(f) and section 2208. The FAA may determine that it must make use of studies not utilized in the current FEIS.[17] If a

---

**17.** We note that the FAA now has the benefit of being able to perform *actual* noise monitoring as the airport is in operation.

"significant" impact is found, section 4(f) and section 2208 require that all reasonable steps be taken to mitigate the damage or adverse impact. We therefore REVERSE the FAA's determination of no significant impact and REMAND to the FAA for further proceedings consistent with this decision.