FILED
United States Court of Appeals
Tenth Circuit

**January 15, 2008**

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

CITIZENS' COMMITTEE TO SAVE
OUR CANYONS, and UTAH
ENVIRONMENTAL CONGRESS,

      Plaintiffs-Appellants,

      v.

FAYE KRUEGER, Forest Supervisor
for the Wasatch-Cache National
Forest; BRIAN FEREBEE, Forest
Supervisor for the Uinta National
Forest, JACK G. TROYER,
Intermountain Region Deputy
Regional Forester, and UNITED
STATES FOREST SERVICE,[*]

      Defendants-Appellees.

WASATCH POWDERBIRD GUIDES,

      Defendant-Intervenor-
      Appellee.

No. 07-4011

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. NO. 2:05-CV-548-TS)**

---

[*] Pursuant to Federal Rule of Appellate Procedure 43(c)(2), public officers'
successors are automatically substituted as parties, resulting in the following
substitutions here: Faye Kreueger for Thomas L. Tidwell, Brian Ferebee for Peter
W. Karp, and Jack G. Troyer for Cathrine L. Beaty.

William B. Lockhart (Sarah Tal, Wildlaw Southwest, with him on the briefs), Salt Lake City, Utah, for Appellants.

Jared C. Bennett, Assistant United States Attorney (Brett L. Tolman, United States Attorney, District of Utah, with him on the brief), Office of the United States Attorney, Salt Lake City, Utah, for Appellees.

Michael J. Malmquist, Parsons Behle & Latimer, Salt Lake City, Utah, on the brief for Intervenor-Appellee.

---

Before **HENRY**, Chief Judge, **EBEL** and **TYMKOVICH**, Circuit Judges.

---

**TYMKOVICH**, Circuit Judge.

---

In this appeal we consider the United States Forest Service's decision to issue a special use permit to Wasatch Powderbird Guides to conduct helicopter skiing operations in two national forests. Citizens' Committee to Save Our Canyons and Utah Environmental Congress argue the decision violated the National Forest Management Act and the National Environmental Policy Act. The district court upheld the Forest Service permit.

Exercising jurisdiction under the Administrative Procedure Act, 5 U.S.C. §§ 701–706, and 28 U.S.C. § 1331, we affirm.

## I. Background

Wasatch Powderbird Guides ("WPG") has continuously operated a guided helicopter skiing business in the Wasatch-Cache and Uinta National Forests since 1973. It operates pursuant to special use permits periodically issued by the Forest

Service.  In this appeal, Citizens' Committee to Save Our Canyons and Utah Environmental Congress (collectively "SOC"), challenge the renewal permit issued to WPG in 2005.  Prior to the 2005 permit, WPG operated under a permit issued in 2000.

SOC are non-profit organizations comprised of members who use the areas in which WPG operates for non-motorized uses such as backcountry skiing, snowshoeing, hiking, and camping.  They claim their recreational opportunities and experiences are diminished by WPG's operations and argue the Forest Service failed to comply with relevant laws when issuing WPG's most recent permit.

## A.  *The Wasatch-Cache and Uinta Forest Plans*

Under the National Forest Management Act, the Forest Service manages national forests pursuant to forest plans periodically developed for each forest. The Wasatch-Cache and Uinta forest plans were initially adopted in 1985.  At that time, the Wasatch-Cache plan expressly recognized helicopter skiing as "a legitimate use of the National Forest" and called for "one helicopter ski special use permit on the present permit area."  Supp. App. 669–70.  The original Uinta plan also directed the forest would be open to helicopter skiing under a special use permit.  Supp. App. 666.

The Forest Service revised the Wasatch-Cache plan in 2003.  The 2003 plan established the following as forest-wide goals: "Manage for an array of recreation opportunities and settings to improve the quality of life for a variety of Forest

recreation users. Balance growth and expansion of recreation by managing within the capability of sustainable ecosystems found on the Forest for today and the future." Supp. App. 672. Specifically regarding helicopter skiing, the 2003 Wasatch-Cache plan provides,

> Helicopter skiing will continue to operate as a component of the recreation picture in the Central Wasatch. Helicopter skiing and ski mountaineering will continue to compete for untracked conditions, and those users seeking quiet in the winter backcountry may continue to object to helicopter skiing. Information will continue to be available to all backcountry visitors to help them make informed decisions and avoid conflicts. . . . It is uncertain, however, whether helicopter skiing can be managed to remain profitable over the long term while accommodating a reasonable level of compromise with competing backcountry uses.

Supp. App. 673.

The Uinta forest plan was also revised in 2003. The 2003 Uinta plan provides for "[d]iverse and suitable recreational opportunities . . . responsive to public demand while maintaining ecosystem health and contribution to social and economic sustainability." Supp. App. 667. The Uinta plan specifically provides for helicopter skiing "consistent with the resource capability, other land uses, and other resource management goals." Supp. App. 668.

## B. WPG's 2000 Permit

Although SOC challenges WPG's 2005 permit, the dispute in this case goes back to the permitting process for WPG's 2000 permit.

When WPG applied for its 2000 permit, the 1985 forest plans governed the permitting decision. The Forest Service at the time interpreted the 1985 forest plans as requiring the forests to allow helicopter skiing. Accordingly, when the Forest Service began developing an Environmental Impact Statement ("EIS") for the 2000 permit decision, the Forest Service identified that the purpose and need of the proposed action was to "[c]ontinue one helicopter ski special use permit on the present area." Supp. App. 626. This need would be met by "[a]llowing for an economically viable helicopter skiing operation." Supp. App. 625.

The final EIS for the 2000 permit thus analyzed each option based on whether it would allow WPG to remain economically viable. The 2000 permit the Forest Service ultimately approved set forth a number of restrictions on WPG's operations, including limiting WPG's operating season, closing the national forests to helicopter skiing on Sundays and Mondays, limiting WPG to using one helicopter in certain areas, and limiting the number of skiers WPG could serve.

WPG appealed the decision to the Regional Forester, arguing the restrictions threatened its economic viability. Based on the understanding that the 1985 forest plans required the Forest Service to ensure its helicopter skiing permittee was economically viable, the Regional Forester ordered a financial analysis of WPG's operations. The financial analysis revealed that limiting weekend operations and limiting WPG to one helicopter in certain areas were key constraints on WPG's economic viability. But rather than amending the 2000

-5-

permit, the Forest Service decided to incorporate the information gleaned from the financial analysis into the analysis for the next permit application.

## C. WPG's 2005 Permit

WPG's 2005 permit was issued under the new 2003 forest plans, rather than the 1985 forest plans that governed the 2000 permit. To highlight the change in focus of the 2003 forest plans, the draft EIS for the 2005 permit provided,

> The Forest Service emphasizes the fact that the agency is not responsible for any permittee's economic viability. While private sector economic concerns are not necessarily those of the federal government, the success or failure of a permittee may have a considerable bearing on the Forest Service's ability to meet the mandate to provide a range of quality recreational opportunities on lands under our administration.

Aplt. Excerpts of R. [ER] 520. The Forest Service also identified as an unmet need "provid[ing] improved operating efficiencies for WPG relative to the current permit while seeking to minimize conflicts between heli-skiing and other winter recreational uses." ER 521. The Forest Service "recognize[d] that there is a measure of conflict inherent in this statement of needs. On the basis of this analysis, the decision maker will endeavor to achieve a *balance that can be maintained through the term of the permit*." ER 521 (emphasis supplied).

Accordingly, the draft EIS analyzed a range of alternatives, including not issuing a permit and various limitations on WPG's operating season, days, and area. The draft EIS incorporated much of the analysis from the 1999 EIS, which was prepared for the 2000 permit. *See* 40 C.F.R. § 1502.21 (encouraging

-6-

agencies to incorporate material by reference). Particularly, it incorporated the 1999 EIS's analysis of the safety impact of WPG's use of explosives to test slope stability and the noise impacts of WPG's operations on other backcountry users.

But the draft EIS also distinguished its analysis from the 1999 EIS:

> The 1999 EIS provided a detailed analysis of the impacts of various permit terms on WPG's economic viability. However, the revised Forest Plans for the [Wasatch-Cache and Uinta National Forests] clarify the relationship between the Forest Service and outfitter and guide permittees, including the agency's perspective on permittee's economic viability. The agency's concern is provision of a range of recreational opportunities on the lands under their administration. While it is recognized that a permittee cannot continue to provide a recreational opportunity if the permitted operation is not economically viable, viability in itself is not an agency concern.

ER 522. It then concluded:

> Therefore, the focus of this analysis is on whether or not the terms of a given permit would provide WPG with adequate operational flexibility to continue to provide a quality heli-skiing experience. . . . Economic viability, per se, was determined to be outside the scope of the analysis on the basis of the current Forest Plan direction.

ER 522.

Numerous comments on the draft EIS, including one from SOC, accused the Forest Service of considering WPG's economic viability, in the guise of "operational efficiency," in violation of the 2003 forest plans. SOC also suggested the term "operational efficiency" should be defined, and set forth reasons why WPG's economic viability would not actually be threatened by increased restrictions. ER 513–15.

In response to comments like these, the Forest Service in the final EIS defined "operating efficiency" as "how the operational conditions of the permit negatively or positively affect the permittee's ability to provide the type and level of recreational opportunity desired by the Forest Service." ER 526. The Forest Service reiterated "the economic viability of outfitter and guide permittees is not the agency's concern." ER 675. Rather,

> the Forest Service's interest is in retaining heli-skiing as a recreational opportunity on the [Wasatch-Cache and Uinta National Forests], as long as other values are maintained. To meet this objective in a sustainable way, and with the least environmental impact, requires an efficient heli-ski operation. Thus, while WPG's economics are not a Forest Service concern, their operational efficiency is.

ER 675.

### D. Prior Proceedings

On October 14, 2004, the Forest Service issued a Record of Decision outlining the decision to issue another five-year permit to WPG and adopting the following permit restrictions: WPG may (1) operate between December 15 and April 15, plus five additional days outside of this period, but days used before December 15 must be for noncommercial purposes; (2) not operate in the most heavily used area of the forest on Sundays and Mondays, except that WPG may operate on three Mondays if it does not operate on the preceding Saturday; (3) operate on three Sundays or Mondays if it collects skiers at the end of the day by van rather than helicopter; (4) use two helicopters in the most heavily used area

-8-

five days per season; (5) provide 1,600 total skier days[1] in the permit area, half of which may be used in the most heavily used area; and (6) use up to 300 explosive charges per season to test slope stability.  ER 691–92, 700.

SOC appealed the Record of Decision, and the Regional Forester affirmed. SOC then filed this action in federal district court challenging the Regional Forester's decision.  SOC argued the Forest Service (1) violated the National Forest Management Act ("NFMA") because the permitting decision was inconsistent with the Wasatch-Cache and Uinta forest plans and (2) violated the National Environmental Policy Act ("NEPA") by failing adequately to consider potential environmental impacts.

The district court found for the Forest Service, and SOC appeals.

## II.  Discussion

SOC first argues the Forest Service violated the forest management laws embodied in NFMA.  SOC contends that, by the Forest Service's own interpretation of the 2003 forest plans, the Forest Service should not have considered WPG's economic viability.  By considering WPG's operational efficiency, the Forest Service in effect considered economic viability in violation of the forest plans.

Second, SOC argues the Forest Service violated the environmental laws contained in NEPA in two ways: (1) the Forest Service prevented the public from

---

[1] A skier-day consists of eight runs by one skier.  ER 672.

commenting on WPG's economic viability, a significant decision-making factor, by insisting that it would not consider economic viability and couching the consideration of economic viability in the term "operational efficiency"; and (2) the Forest Service did not sufficiently analyze increasing recreational pressures in the forests that affect the safety of forest users and noise impacts associated with WPG's operations.

We agree with the district court that the permitting decision complied with both NFMA and NEPA.

## A.  Standard of Review

Under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, which governs judicial review of agency actions, we review the lower court's decision de novo.  *N.M. Cattle Growers Ass'n v. U.S. Fish & Wildlife Serv.*, 248 F.3d 1277, 1281 (10th Cir. 2001).  "Under the APA we set aside the agency's action . . . if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  *Center for Native Ecosystems v. Cables*, — F.3d —, No. 06-1130, 2007 WL 4376063, at *9 (10th Cir. Dec. 17, 2007) (quoting 5 U.S.C. § 706(2)(A)).  We will also set aside an agency action if the agency has failed to follow required procedures.  *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1574 (10th Cir. 1994); 5 U.S.C. § 706(2)(D).

"Our review is highly deferential."  *Ecology Center v. U.S. Forest Serv.*, 451 F.3d 1183, 1188 (10th Cir. 2006) (quotation omitted).  "The duty of a court

reviewing agency action under the 'arbitrary or capricious' standard is to ascertain whether the agency examined the relevant data and articulated a rational connection between the facts found and the decision made." *Olenhouse*, 42 F.3d at 1574. Furthermore, "[i]n reviewing the agency's explanation, the reviewing court must determine whether the agency considered all relevant factors and whether there has been a clear error of judgment." *Id.*; *accord Utah Envtl. Cong. v. Bosworth*, 443 F.3d 732, 739 (10th Cir. 2006). "A presumption of validity attaches to the agency action and the burden of proof rests with the appellants who challenge such action." *Colo. Health Care Ass'n v. Colo. Dep't of Soc. Serv.*, 842 F.2d 1158, 1164 (10th Cir. 1988).

We turn to whether the Forest Service's permitting decision in this case complied with NFMA and NEPA.

## B. NFMA

NFMA requires the Forest Service to "develop, maintain, and, as appropriate, revise land and resource management plans for units of the National Forest System." 16 U.S.C. § 1604(a). All permits the Forest Service issues "for the use and occupancy of National Forest System lands shall be consistent with the land management plans." *Id.* at § 1604(i).

SOC argues WPG's permit is inconsistent with the 2003 forest plans. SOC argues the Forest Service interpreted its own forest plans as prohibiting the

consideration of WPG's economic viability, but then employed economic considerations in the permitting decision.

To support its argument, SOC quotes a single sentence from the section of the EIS discussing public involvement and issues reviewed by the Forest Service. It suggests the following language embodies the Forest Service's extant interpretation of the 2003 forest plans: "Economic viability, per se, was determined to be outside the scope of this analysis on the basis of current Forest Plan direction." ER 582.

Given the context of this statement and the document as a whole, we cannot agree this sentence alone constitutes the Forest Service's interpretation of the forest plans. Taken as a whole, the EIS shows the forest plans require the Forest Service to balance a variety of recreational activities in the permit area, including, if possible, helicopter skiing. Nothing in the EIS prohibits the consideration of broad economic factors in the permitting process. Rather, the EIS interprets the forest plans as redirecting the perspective of the Forest Service to recreational opportunities as a whole, with a due consideration for the effect of permit conditions on proposed operations.

The EIS goes to great lengths to explain the role of economic viability in its analysis. It explains, for example, how the 2003 forest plans changed the focus of the permitting decision from requiring consideration of a permitee's economic viability to a more balanced approach; and how, consistent with this

-12-

change in focus, considering WPG's operating efficiencies better meets the new forest plans' goals than examining WPG's economic viability—as the Forest Service had prior to issuing the 2000 permit.

In particular, the very paragraph SOC quotes from explains that the forest plans require the Forest Service to provide "a range of recreational opportunities on the lands under their administration" including the "Forest Service's interest in retaining heli-skiing as a recreation opportunity [within the forests]." ER 582, 675. The EIS explicitly acknowledges that certain restrictions on permittee operations could limit the kinds of recreational opportunities available in the forests and interfere with forest plan goals if permittees cannot operate under the established restrictions. ER 582.

In accordance with this interpretation of the forest plans, the EIS examined various options and concluded an acceptable balance between helicopter skiing and other uses could be reached by imposing certain restrictions on WPG's operations. These restrictions reflect no special consideration for WPG's economic viability beyond the goal of providing "a range of diverse, recreational opportunities" including helicopter skiing. ER 538. The EIS thoroughly explains the Forest Service's approach, and the 2005 permit includes a number of reasonable restrictions on WPG with the goal of allowing both helicopter skiers and other backcountry users to enjoy the national forests. In the end, the Forest

Service's permit reflected the "type and level" of heli-skiing it thought appropriately balanced the competing recreational uses in the forests.

Taking the interpretation of the forest plans represented by the EIS as a whole, the EIS and the ultimate permitting decision comply with the Forest Service's interpretation of its forest plans. The Forest Service properly considered how particular options would affect the range of recreational opportunities available in the forests and balanced interests in a way it believed promoted multiple forest uses. Rather than violating the forest plans, this approach of promoting a variety of recreational opportunities is directly in line with the forest plans' goals.

In short, we cannot conclude this result or the process used to reach it violates NFMA's directive that permits be consistent with forest plans.

## C. NEPA

Under NEPA, a federal agency must prepare an EIS before it takes any action "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). The EIS must examine "(i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action, (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (v) any irreversible

and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." *Id.*

"NEPA places upon federal agencies the obligation 'to consider every significant aspect of the environmental impact of a proposed action.' It also ensures that an agency will inform the public that it has considered environmental concerns in its decision-making process." *Utah Shared Access Alliance v. U.S. Forest Serv.*, 288 F.3d 1205, 1207 (10th Cir. 2002) (quoting *Baltimore Gas & Elec. Co. v. Natural Res. Defense Council*, 462 U.S. 87, 97 (1983)); *accord Ecology Center*, 451 F.3d at 1189.

NEPA does not, however, "require agencies to elevate environmental concerns over other appropriate considerations . . . ; it requires only that the agency take a 'hard look' at the environmental consequences before taking a major action. In other words, it prohibits uninformed—rather than unwise—agency action." *Utah Shared Access Alliance*, 288 F.3d at 1207–08 (quotation omitted). "The role of the courts in reviewing compliance with NEPA is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary and capricious." *Id.* at 1208 (quotation omitted).

SOC argues the EIS was inadequate under NEPA because (1) the Forest Service failed to adequately disclose and solicit public comment in the way it handled the issue of operational efficiency, and (2) the Forest Service

inadequately analyzed other environmental impacts, including usage, safety and noise.

### 1. *Public Comment*

Under NEPA regulations, the agency must publish a draft EIS for public comment and respond to those comments in the final EIS. 40 C.F.R. §§ 1502.9, 1503.1, 1503.4. The goal is to "inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1. "[EISs] shall be written in plain language and may use appropriate graphics so that decisionmakers and the public can readily understand them." 40 C.F.R. § 1502.8. SOC argues the Forest Service failed to comply with these regulations because it did not identify WPG's economic viability as a significant issue in the EIS and the public therefore had no opportunity to comment on one of the major factors the Forest Service considered in its decision.

As discussed above, the draft EIS explained how the 2003 forest plans altered the focus of the heli-ski permitting decision when compared to the 1985 forest plans. While the draft EIS explained the forest plans had shifted the focus away from a mandate of the permittee's economic viability, it explicitly acknowledged "the success or failure of a permittee may have a considerable bearing on the Forest Service's ability to meet the mandate to provide a range of quality recreational opportunities." ER 520.

In response to the draft EIS, the Forest Service received comments to the effect that it should not consider WPG's economic viability at all and that operational efficiency should be defined. ER 675–76, 686–87. In particular, SOC itself commented on the draft EIS, as it argued in this appeal, that the Forest Service was effectively considering WPG's economic viability in the guise of operational efficiency. ER 513–14. SOC even went on to explain how WPG could continue to operate as an economically viable business even under more restrictive permit conditions. ER 514–15.

The Forest Service's response to these comments reiterated that the Forest Service was not concerned with WPG's economic viability, but that its goal was "retaining heli-skiing as a recreational opportunity on the [Wasatch-Cache and Uinta National Forests], as long as other values are maintained." ER 675. The Forest Service again repeated that a more efficient helicopter skiing operation would better "meet this objective in a sustainable way, and with the least environmental impact." ER 514–15. In the draft EIS and the response to public comments, the Forest Service clearly articulated its decisionmaking criteria and the basis for its eventual decision. The Forest Service explained that the term "operational efficiency" obviously subsumes some element of economic consideration. The public, including SOC, had a full opportunity to comment on these criteria, and the public in fact submitted relevant comments. No one was misled.

-17-

Because the Forest Service articulated a rational basis for its consideration of operational efficiency and considered public comments, the Forest Service's action was not arbitrary and capricious on this account.

## 2. Environmental Impact

SOC also argues the permitting decision was arbitrary and capricious for failure to consider important environmental consequences. It claims the Forest Service insufficiently analyzed the risk to other forest users from WPG's explosives and the effect on other users of helicopter noise. In particular, SOC argues the discussion of these issues in the most recent EIS relied on the 1999 EIS, and that backcountry use had increased so dramatically that the Forest Service needed to develop a new analysis of patterns of backcountry use, and the Forest Service needed to develop a more comprehensive analysis of helicopter noise patterns.

Under NEPA, the EIS should take a "hard look" at the impacts of a proposed action. *Friends of the Bow v. Thompson*, 124 F.3d 1210, 1213 (10th Cir. 1997); *see* 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.4. But NEPA's "hard look" does not necessarily require the agency to develop "hard data." *Ecology Center*, 451 F.3d at 1190. The Forest Service meets the "hard look" requirement by "present[ing] the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options." 40 C.F.R. § 1502.14. "[O]nce environmental concerns

are adequately identified and evaluated by the agency, NEPA places no further constraint on agency actions." *Friends of the Bow*, 124 F.3d at 1213 (quotation omitted).

The EIS in this case adequately identified and evaluated (1) increasing recreational use of backcountry areas, (2) the impact of WPG's operations on the safety of other forest users, and (3) the noise impacts of WPG's helicopters in the permit area. The Forest Service thus complied with NEPA's "hard look" requirement.

### a. Increased Backcountry Usage

The Forest Service identified and evaluated as an important issue increasing usage of backcountry recreation areas. The EIS for the 2005 permit recognized that use of the backcountry for winter recreation has been increasing, but "[r]eliable estimates of the number of individuals recreating in the Central Wasatch backcountry during the winter are still not available. The question can be addressed at one level by looking at national trends, which show that . . . alternatives to resort skiing have gained significant popularity over the past decade." ER 589. Based on trends in equipment sales, calls to the Utah Avalanche Forecast Center, and observations by Forest Service personnel, WPG employees, and backcountry users themselves, the EIS concluded, "most of the anecdotal information reviewed for this analysis suggests that winter backcountry use is high and growing, and that the trend is likely to persist. Some incremental

shifts in the types and patterns of backcountry recreation other than heli-skiing may have occurred but cannot be reliably documented." ER 590–91. Accordingly, the EIS adopted the 1999 EIS's analysis of backcountry usage patterns, while allowing for an overall increase in usage. ER 591.[2]

In response to public comments on the absence of hard data, the Forest Service concluded the "updated but still largely qualitative information on other backcountry use in the permit area considered in this analysis is sufficient for public disclosure and informed decision making." ER 680. "[T]he Forest Service acknowledges that the backcountry sees relatively high levels of recreation use, [and] such use is likely to increase over time . . . . However, the EIS provides adequate information to make the decision at hand and is consistent with the requirements of NEPA." ER 680. Although the Forest Service acknowledged backcountry use had increased since the 1999 EIS, the Forest Service concluded with regard to safety, "[n]o new circumstances or information has developed since the 1999 analysis that would alter the[] conclusions" from the 1999 EIS. ER 572, 573. Thus the Forest Service specifically considered whether its data was sufficient and concluded that it was.

---

[2] The 1999 EIS referred to three reports based on (1) trailhead interviews during the winters of 1993 and 1994 conducted by the Forest Service and the University of Utah; (2) observations by WPG; and (3) an independent survey. ER 96–97. Interpreting this information, the Forest Service identified the most heavily used trailheads and areas by backcountry users. ER 98–102, 110. The Forest Service also identified higher backcountry use on weekends. ER 110–11.

The information the Forest Service gathered supports its conclusion that additional data was unnecessary to its decision. In particular, the Forest Service concluded that if it "anticipated that heli-skiing would be curtailed at some specific level of backcountry use, more and better data might be relevant." ER 680; *see also* ER 703 (noting further "study might be appropriate if the Forest Plan directs that recreation use be capped at certain levels, or if agency direction requires some uses to be given preference over others"). Given the Forest Service's goal of balancing recreational opportunities, the qualitative information it obtained—specifically that non-motorized backcountry use was increasing and was heaviest in areas nearest to population centers and on weekends—enabled it to craft permit terms to minimize conflict between user groups. For example, the Forest Service considered alternatives and adopted permit terms limiting WPG operations in the most heavily used area on weekends.

In short, the information the Forest Service gathered was sufficient to "sharply defin[e] the issues and provid[e] a clear basis for choice among options." 40 C.F.R. § 1502.14.

## b. Safety

The EIS discussed the risks and benefits of WPG's explosives use and determined any risk was minimal. The information gathered in the EIS and incorporated from the 1999 EIS supports the conclusion that WPG's operations present minimal risk beyond the general risk presented by increased backcountry

use. ER 148; *see also* ER 80–81 (noting "the probability of accidents and injuries involving backcountry recreationists increases with the number of people involved," simply because all backcountry users risk triggering avalanches).

First, the Forest Service described the risk presented by WPG's operations. WPG uses explosives only to test for slope stability; WPG does not use explosives to trigger avalanches or control avalanche slide paths. ER 118–119, 685. Furthermore, WPG uses explosives only when all other measures of slope stability have proven inconclusive. ER 118. Using this approach, WPG triggers very few avalanches. ER 118, 130.

Second, the Forest Service imposed additional restrictions on WPG to minimize the risk to others from any potential avalanches. WPG must conduct testing before 9:00 a.m. or as early as practical, fly over the area before testing, and test only when visibility is at least .5 miles. ER 121, 147, 566, 684, 700. These measures have been effective at mitigating any safety hazard: WPG in its more than thirty years of operation has never released an avalanche that injured another recreationist; nor have any injuries been associated with WPG's explosives use, even as backcountry use has increased. ER 572–73.

Finally, the Forest Service recognized WPG's positive impact on avalanche safety through input to the Utah Avalanche Forecasting Center, the provision of guides trained in avalanche risk to relatively inexperienced skiers, contributions to other organizations' avalanche control work, and rescue assistance. ER 149.

The Forest Service concluded WPG's "efforts serve not only to make WPG's operation as safe as possible, but to help minimize the avalanche risk to all other users of the Wasatch backcountry." ER 119. Eliminating explosives use would involve "removal of one tool used to safeguard helicopter skiers, as well as those sharing terrain with them, from avalanches; and some decrease in the quality of the slope stability information WPG provides to the resorts, UDOT, and UAFC." ER 168. Although the Forest Service "recognize[d] that explosives testing has undesireable side effects," it allowed WPG up to 300 charges per year "to retain the cited benefits while capping the risks at current levels." ER 168.

This discussion of explosives use "articulate[s] a rational connection between the facts found and the decision" to permit WPG limited explosives use. *Olenhouse*, 42 F.3d at 1574.

### c. Noise

Lastly, the Forest Service also adequately identified and evaluated the noise generated by WPG's operations. The EIS identified WPG's noise impact as the most commonly reported complaint among other backcountry users and ranked alternatives in terms of potential for noise generation. ER 532–34, 569. The Forest Service identified the number of helicopters in operation as the major factor affecting noise generation and incorporated the analysis of the 1999 EIS concluding that noise levels are highest in close proximity to a helicopter and when a backcountry user is present in the same drainage as a helicopter. ER 116,

569, 581. The Forest Service concluded "the degree of impact depends on several factors, including: spatial and temporal proximity to the helicopter, the type and location of the other recreational activities occurring, the sensitivity of the people involved." ER 621. We think this constitutes sufficient information to evaluate the noise impact of the WPG permitting decision.

Particularly, the Forest Service recognized permit restrictions as a means of mitigating noise and reducing conflicts with other backcountry users related to noise. The Forest Service recognized that noise impacts vary by "the type of heli-ski permit restrictions in place (e.g., structured restrictions resulting in more predicatable, more localized, and more intensive impacts v. flexible restrictions associated with less predictable, more widespread, less intensive impacts)." ER 621. "[S]ome level of impact on other recreationists is unavoidable, but the terms of the heli-ski permit provide the means of managing these impacts." ER 569.

The Forest Service also recognized that WPG had managed to reduce conflicts with other users under terms of the 2000 permit. ER 569, 598. Accordingly, the Forest Service continued to apply permit terms allowing other backcountry users to avoid WPG's operations if they so desired and to require WPG to "notify the public of its operating plans a day in advance" through the Utah Avalanche Center recorded information line and website, WPG's website, and the Wasatch-Cache National Forest website. ER 624, 701. WPG also must

avoid flying through passes and along ridges occupied by other users when possible.  ER 623, 701.

SOC argues the Forest Service's decision was arbitrary and capricious because it did not have the benefit of empirical data mapping noise distribution in the permit area and did not have the benefit of comments from other federal agencies with expertise relating to aircraft noise.  We agree with the Forest Service that "[w]hile more information could be collected on any particular issue, the EIS provides a sufficient basis for making an informed decision, taking into account how noise impacts might vary by alternative."  ER 683.

The Forest Service was not required to base its decision on a conclusion that some particular level of noise was either acceptable or unacceptable.  *Cf. Nat'l Parks & Conservation Ass'n v. Fed. Aviation Admin.*, 998 F.2d 1523, 1533 (10th Cir. 1993) (finding agency failure to develop evidence arbitrary and capricious when agency was required to determine whether noise would significantly impact parks users' recreational experiences).  Instead, the Forest Service was required to meet the mandates of its forest plans by providing quality helicopter skiing opportunities "while seeking to minimize conflicts between heli-skiing and other winter recreational uses."  ER 521.  To address this problem, the Forest Service identified an effective means of minimizing conflict by giving other users means to avoid WPG operations by imposing permit restrictions that make predictable WPG's operations and consequent noise impacts.  Additional

empirical data would not assist the Forest Service in "sharply defining the issues and providing a clear basis for choice among options" for minimizing user conflict. 40 C.F.R. § 1502.14.

\* \* \*

In sum, the Forest Service's EIS fully disclosed and considered the impact of its decision to issue a special use permit to WPG. "Our objective is not to 'fly speck' the [EIS], but rather, to make a pragmatic judgment whether the [EIS]'s form, content and preparation foster both informed decision-making and informed public participation." *Custer County Action Ass'n v. Garvey*, 256 F.3d 1024, 1035 (10th Cir. 2001) (quotation omitted). The NEPA process in this case, including extensive public comment, considered a variety of options and yielded a number of reasonable restrictions on WPG's operations designed to minimize conflict among forest users. This is all NEPA requires.

### III.  Conclusion

For the foregoing reasons, we AFFIRM the decision of the district court.