**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 25 2002**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

THE UTAH SHARED ACCESS
ALLIANCE and ANTHONY
CHATTERLEY,

     Plaintiffs - Appellants,

v.

UNITED STATES FOREST SERVICE
and MARY WAGNER, in her official
capacity as Forest Supervisor of
Dixie National Forest,

     Defendants - Appellees,

SOUTHERN UTAH WILDERNESS
ALLIANCE; THE WILDERNESS
SOCIETY; AMERICAN LANDS
ALLIANCE; SIERRA CLUB, Utah
Chapter; GREAT OLD BOARDS
FOR WILDERNESS; WILDLANDS
CENTER FOR PREVENTING
ROADS; and JOHN GALLAND,

     Defendants - Intervenors -
     Appellees.

No. 00-4146

---

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 99CV0349C)**

Kristen L. Cassisa (William Perry Pendley and D. Andrew Wight, Mountain States Legal Foundation, Denver, Colorado, on the briefs ) for Plaintiffs-Appellants.

David C. Shilton, Dept. of Justice, Washington, D.C. (Lois J. Schiffer, Ass't. Attorney General, Environmental & Nat. Resources Division, Paul M. Warner, U.S. Attorney and Stephen Roth, Asst. U.S. Attorney, Salt Lake City, Utah; Lisa Jones, Dept. of Justice, Washington, D.C., and Kenneth D. Paur, Office of Gen. Counsel, U.S. Dept. of Agriculture, Ogden, Utah, on the briefs) for Defendants-Appellees.

Stephen H. M. Bloch (Heidi J. McIntosh and Stephen H.M. Bloch, Southern Utah Wilderness Alliance, Salt Lake City, Utah, on the briefs) for Defendants-Intervenors-Appellees.

---

Before **EBEL**, Circuit Judge, **McWILLIAMS**, Senior Circuit Judge, and **BROWN\***, Senior District Judge.

---

**BROWN**[*], Senior District Judge.

---

This suit involves a decision by the Forest Service to close numerous roads on Boulder Top, a popular recreation area in the Dixie National Forest near Teasdale, Utah. The decision was taken as part of an effort to reduce sedimentation in lakes on Boulder Top. Biologists had observed that sedimentation was contributing to increased winter kill of trout populations in area lakes, and the Forest Service concluded that poorly constructed roads on Boulder Top were a major source of the problem. Appellant Utah Shared Access Alliance ("US-ALL") challenged the Forest Service's decision in U.S. District Court, arguing that the Service failed to comply with its obligations under the

[*]The Honorable Wesley E. Brown, Senior District Judge for the District of Kansas, sitting by designation.

2

National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq. Among other things, US-ALL argued the Forest Service failed to take a "hard look" at the potential environmental consequences of the proposed action as required by NEPA, and erroneously determined that the action would not significantly affect the quality of the human environment. The district court granted summary judgment in favor of the defendants, finding the Forest Service had complied with NEPA and that its decision was not arbitrary or capricious.[1] We have jurisdiction pursuant to 28 U.S.C. § 1291, and affirm for the reasons that follow.

I.

General Requirements of NEPA. NEPA calls for all federal agencies to use a "systematic, interdisciplinary approach" in agency decision-making, taking into account the natural and social sciences and the environmental design arts. 42 U.S.C. § 4332(A). Among other things, NEPA requires federal agencies to prepare a detailed statement of the environmental impact for "major Federal actions significantly affecting the quality of the human environment." § 4332(C).

NEPA has been implemented in part by regulations of the Council on Environmental Quality. See 40 C.F.R. § 1500 et seq. Under the regulations, an agency

---

[1] Anthony Chatterley, a disabled recreational user of Boulder Top, was also a named plaintiff in the complaint filed in district court, but his claims were dismissed for lack of standing. Aplt. App. at 0887. Chatterley was listed as an appellant in the notice of appeal, but appellants now concede the dismissal of his claims. See Aplt. Br. at 4.

contemplating action may be required to prepare an "environmental assessment" (or "EA") containing a concise discussion of environmental considerations and providing a basis for the agency to determine whether the action is a major one. If the agency finds that the action will not significantly affect the human environment (and is thus not a major action), it makes a "Finding of No Significant Impact" (or "FONSI"). If it finds the action will significantly affect the environment, it is then required to prepare a more extensive analysis in the form of an "environmental impact statement" (or "EIS"). See Airport Neighbors Alliance, Inc. v. United States, 90 F.3d 426, 429 (10th Cir. 1996).

NEPA places upon federal agencies the obligation "to consider every significant aspect of the environmental impact of a proposed action." Baltimore Gas & Elec. Co. v. Natural Res. Defense Council, 462 U.S. 87, 97 (1983). It also ensures that an agency will inform the public that it has considered environmental concerns in its decision-making process. Id. The Act does not require agencies to elevate environmental concerns over other appropriate considerations, however; it requires only that the agency take a "hard look" at the environmental consequences before taking a major action. Id. In other words, it "'prohibits uninformed -- rather than unwise -- agency action.'" Custer County Action Ass'n. v. Garvey, 256 F.3d 1024, 1034 (10th Cir. 2001). The role of the courts in reviewing compliance with NEPA "is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary and capricious." Baltimore Gas & Elec., 462 U.S at 97-98.

II.

Boulder Top is a 50,000 acre plateau at about 11,000 feet elevation on top of Boulder Mountain in the Dixie National Forest. It is interspersed with numerous lakes and forest areas and is a popular recreation destination for camping, fishing, hiking and hunting.

Sixteen lakes on Boulder Top are managed for fish production. The main fish species on Boulder Top include brook trout and Yellowstone cutthroat trout. Lakes on Boulder Top that support sport fishing are generally more productive than high-altitude lakes in other areas of Utah. The lakes that consistently overwinter trout have sufficient depth and volume to supply fish through the long winter, when snow and ice cover prevent photosynthesis and the atmospheric input of oxygen. Many of the lakes on Boulder Top are relatively shallow, and there is a delicate balance concerning a lake's ability to overwinter trout from one year to the next. For this reason, any decrease in lake depth from sediment accumulation can decrease or eliminate trout survival. See Aplt. App. at 0170.

The Boulder Top area contains approximately 131 miles of vehicular routes. The road system was summarized by the Forest Service as follows:

> The majority of the roads are the result of past and ongoing dry log timber harvest activities. Other roads have resulted from recreationists seeking access to lakes and scenic overlooks, and permittees driving between grazing allotments. In almost all cases, very little thought was given to proper road location, design standards, or maintenance objectives.

5

Roads were located so as to incur the least amount of work and therefore costs. Many have resulted from simply driving across the gently rolling open meadows, weaving among the rocks wherever possible. Where trees have been encountered, primitive road prisms have been constructed if it was physically impossible to weave among the rocks and trees. The net result is a system of low speed primitive roads passable to high clearance vehicles during dry weather, but requiring 4-wheel drive during inclement weather.

Road maintenance on the Boulder Top has been minimal. Those involved in the harvest of dry logs have made a good faith effort to maintain the roads they are using, but due to the road prisms and materials available to work with, their efforts are somewhat futile and short lived. Maintenance has consisted for the most part of surface blading which usually lasts until the next storm when re-rutting of the travel way occurs once again. Most of the road prisms consist of wheel tracks if blading hasn't occurred and a trench section if blading has been performed. Re-blading of the "trench section" tends to just deepen the roadway, allowing for the collection of more water and thus numerous mud holes. When the mud holes become impassible, the practice has been to drive around them, resulting in a torn up, dual or triple tracked section of roadway.

The "constructed" sections of roadway generally are in timbered areas or areas of excessive rock. Typical sections consist of a narrow road prism, often trenched, with slash and boulders lining both sides of the roadway, thus preventing proper maintenance or drainage work.

Aplt. App. at 0165.

In the early 1980's, Utah Department of Wildlife Resource ("UDWR") fisheries biologists realized that many of the lakes on Boulder Top were being impacted by sediment. Many lakes that had historically supported overwintering populations of trout

6

were becoming shallower due to increased sediment, and as a result, winter kill of trout was becoming more prevalent. Over the course of several years the UDWR attempted to reduce winter kill through the use of mechanical aerators, but eventually decided these attempts were not beneficial and were not addressing the root of the problem. According to biologists, much of the sediment increase in the lakes was attributable to poorly located, constructed or improperly drained roads. UDWR eventually recommended that the Forest Service take steps to reduce the sedimentation. Aplt. App. at 0171.

By 1993, the Forest Service had commenced a study of the Boulder Top area. On June 3, 1997, the Forest Service published an Environmental Assessment ("EA") for Boulder Top with a proposed action and various alternative proposals. The EA determined that action was needed to "correct the sediment entering the lakes from improper road location and drainage," and said the purpose of the proposed action was to "improve watershed conditions, fisheries and the road system on Boulder Top to reduce on-going damage." Aplt. App. at 0149. The EA noted that although sedimentation of lakes is a natural process, "[t]he sediment impacts from roads and other uses in the riparian areas around the lakes has accelerated sedimentation rates," and the increased sedimentation "is a serious threat to fisheries on Boulder Top." Id. at 0168. The EA pointed out that lake sedimentation had been identified where poorly located, poorly drained roads provided access to lakes, and noted that "Raft Lake and Meeks Lake, for example, contain sediment deltas formed directly from access roads and gullies

7

originating from those roads." Id. Although the EA identified other activities that also contributed to sedimentation, including timber harvesting and livestock grazing, the Forest Service viewed these as less urgent problems and asserted that "[a] major source of this sediment is unplanned, poorly located, or substandard roads." Id. at 149. In assessing the various alternative courses of action and the potential impact of road closures to remedy the problem, the EA stated "[r]esearch has shown that up to a 75% reduction in soil erosion is possible when road closure is applied as a mitigation. When roads are permanently obliterated, a 95% reduction in erosion from the roadbed is possible (Guide for Predicting Sediment Yields from Forested Watersheds, 1981)." Using these figures, the Forest Service estimated potential decreased sediment yields from roads under each of six alternatives described in the EA, including a "No Action" alternative. The Forest Service's initial proposed action called for closing about 43 miles of roads, leaving 89 miles open. One of the alternative courses of action, identified as "Alternative D," involved closure of about 86 miles of roads. The EA projected that this more extensive action would reduce the sediment yield from roads to about one-half of the yield from taking no action. It involved road closures at 7 of the 11 lakes identified as being impacted by sediment from roadbed erosion. See Aplt. App., Exh. 4. The EA concluded that Alternative D would restore about 130 watershed acres, compared to 75 acres that would be restored under the Forest Service's more limited proposed action. See Aplt. App. at 0161.

Aside from discussing and comparing the various alternatives, the EA listed and discussed mitigation measures to be taken to avoid adverse environmental impacts. The EA also discussed at length (approximately 125 pages) the affected areas of the environment and the projected consequences of the proposed action and the alternatives, including the effects on the watershed, fisheries, plant and wildlife, recreation and wilderness areas, visual quality, and the social/economic impact.

On August 5, 1997, after a review period involving consideration of public comments, the Forest Service issued its first Decision Notice and FONSI. That decision announced that the Forest Service would adopt a combination of the initial proposed action and Alternative D. After various administrative appeals and proceedings, the Forest Service withdrew its first decision. On January 12, 1998, the Forest Service issued a second Decision Notice and Finding of No Significant Impact. Aplt. App. at 0524. The final decision adopted a modified version of Alternative D under which about 89 miles of Boulder Top roads would be closed, leaving 43 miles open to motorized use.

III.

On appeal, US-ALL first contends the Forest Service violated NEPA by failing to take a "hard look" at all of the relevant environmental factors. It objects to the Forest Service's reliance upon the Guide to Predicting Sediment Yields from Forested Watersheds (hereinafter "the Guide"), arguing the Service failed to apply the actual analysis contained in the Guide and "slavishly" adopted that study's quantitative findings

9

without making necessary adjustments for local conditions at Boulder Top. Appellant also contends the Forest Service erred by failing to analyze sediment yields under the method described in Determining the Risk of Cumulative Watershed Effects Resulting from Multiple Activities, USDA Forest Service (1993) or under "some other appropriate scientific method." US-ALL further contends the Environmental Assessment was deficient because it did not consider or propose to address other potential causes of sedimentation, such as livestock grazing.

Aside from challenging the methods used in the Environmental Assessment, US-ALL argues that the Forest Service erred by finding the proposed action would not significantly affect the human environment. According to appellant, application of the factors listed in 40 C.F.R. § 1508.27 shows that this proposed action is in fact a "major" or "significant" one. US-ALL believes the Forest Service failed to adequately consider several important factors in its determination, including the indirect effects of closing a majority of the roads on Boulder Top and the impact upon Boulder Top as a unique geographic area.

IV.

We have considered appellant's challenges to the environmental assessment in this case, but we see nothing to indicate the Forest Service failed to comply with NEPA.

The Forest Service identified a specific need for action "to correct the sediment

10

entering the lakes from improper road location and drainage." Aplt. App. at 149.[2] That need, and the fact that substandard roads were a major source of the lake sediment problem, was amply documented by the observations of UDWR and Forest Service personnel over an extended period of time. For example, a 1992 survey by Forest Service and UDWR biologists identified numerous examples of roadbed erosion into Boulder Top lakes and recommended various road closures. See Aple. Supp. App. at 005458. Common sense alone suggests that a haphazard system of roads in close proximity to lakes would likely be a significant cause of erosion, and there is no dispute that agency personnel documented significant visible effects of lake sedimentation from the roads on Boulder Top. Those observations were duly noted and discussed in the EA. See e.g. Aplt. App. at 216 ("All lakes being impacted by roads show evidence of sediment delta fans forming where the roads approach the lakes. In some instances, the roads have active gullies up to 1.5 feet deep going down to the lakes."). It was not arbitrary or capricious for the Forest Service to rely upon such observations and informed opinions, nor was it arbitrary or capricious for the Service to conclude that the roads on Boulder Top were a major source of lake sedimentation that needed to be remedied.

Appellant contends the Forest Service's use of the Guide to Predicting Sediment

---

[2] The Environmental Assessment also identified two other needs for the project area. One was a need to change the management designation of a portion of Boulder Top from "Timber Management" to "Semi-Private Recreation Opportunities." The other was a need to provide non-motorized trail access to lakes where road access was being changed.

Yields in the course of its assessment was contrary to NEPA's "hard look" requirement because the Service did not follow the detailed formulas in the Guide and used that study's quantitative findings without making adjustments for local conditions. These arguments are unavailing. As noted above, the fact that roads were causing significant sedimentation was documented in the Environmental Assessment. The Forest Service concedes it did not undertake a comprehensive watershed study on the magnitude of the one described in the Guide, but correctly points out that NEPA did not mandate such a massive study as a prerequisite to action. Cf. Sierra Club v. Lynn, 502 F.2d 43, 61 (5th Cir. 1974) ("NEPA does not demand that every federal decision be verified by reduction to mathematical absolutes for insertion into a precise formula."). The record shows that the Forest Service undertook to calculate the on-site erosion that was being caused by the roads on Boulder Top. Aple. Supp. App. at 004898. In doing so, the Service relied upon germane portions of the Guide analyzing sedimentation from roads and the likely reduction to be obtained through road closure or obliteration. We are not persuaded by appellant's argument that this was a misuse of the study. The Guide itself admonishes users to "use their technical expertise [and] considerable professional judgment to assure that reasonable use is made of [the] model. Models are simply tools to assist in decision making, and users ought to test model results against their best technical judgment of what can logically be expected to actually occur on the ground." Aplt. App. at 0013. There is nothing improper about the fact that the Guide was used primarily to estimate the

12

impact of road closures. Moreover, as the district court noted, the record shows the Forest Service in fact took into account variables reflecting local conditions at Boulder Top (including the slope and geological erosion rate for that locale) as part of its discussion and analysis of environmental impact. See Aple. Supp. App. at 004897-004903.

The record shows that the Forest Service used the Guide as a basis for comparison of the various alternatives. It was cited to support the Forest Service's view that the action would significantly reduce sedimentation from roads, noting "[r]esearch has shown that up to a 75% reduction in soil erosion is possible when road closure is applied as a mitigation" and "[w]hen roads are permanently obliterated, a 95% reduction from the roadbed is also possible." Aplt. App. at 0201. Appellant has not shown that reliance upon these figures was irrational or unsound. Under the circumstances, the Forest Service's determination was not arbitrary or capricious, but reflects a rational method of gauging the impact of various alternatives. Cf. Aplt. App. at 0013 (Introduction to the Guide stating, "Although [the model in the Guide] produces specific quantitative values for sediment yield, the results should be treated as rather broad estimates of how real systems may respond. The validity of this model is best when the results are used to compare alternatives, not for predicting specific quantities of sediment yielded.").

Appellant also contends the Forest Service violated NEPA by failing to consider important aspects of the sediment problem, such as the degree to which grazing or other

13

uses contributed to sedimentation, and by failing to analyze the "synergistic and cumulative" effects of multiple sources of siltation under the method described in Determining the Risk of Cumulative Watershed Effects Resulting from Multiple Activities, USDA Forest Service (1993). As the district court noted, however, the Forest Service did consider other aspects of sedimentation in assessing the proposed action. For example, the Forest Service identified grazing as a substantial environmental concern, Aplt. App. at 0168, but decided grazing was being addressed in the East Slope Allotment Management Plan and was beyond the scope of this project, which was directed specifically at the roads. Id. at 0169; Aple. Supp. App. at 005161. In response to public comments, the Forest Service noted that the new allotment plan would defer grazing on Boulder Top one out of every three years, which should give plants a chance to mature and thereby reduce the impact of grazing. Aplt. App. at 0432. Given this fact, and in view of the documented impacts from poorly located and constructed roads, the Forest Service concluded that erosion from the roads presented a greater and more urgent problem that needed to be addressed if the lakes on Boulder Top were to be preserved for fishing. Aplt. App. at 0451. See also Aple. Supp. App. at 004705(1992 Forest Service study noting that although grazing was contributing to the problem, "[p]oor road condition and/or improper road location are yielding the most impacts."). The Forest Service also noted in the EA that recent implementation of proper use standards for livestock grazing and the construction of several grazing exclosures, when combined with

14

the proposed road closures, would begin to improve the riparian habitat condition on Boulder Top. Aplt. App. at 0258. Our review of the record persuades us that the Forest Service gave proper consideration to all relevant aspects in connection with its proposed action. The Forest Service's review contained an assessment of the impact of all current and foreseeable future uses, including livestock grazing, road building, off-road vehicle use, recreation and timber harvesting. The assessment examined the direct, indirect, and cumulative effects of these activities in light of the proposed action. The fact that the Service did not employ a particular method of analysis in its study, such as the approach for determining impacts on endangered species described in Determining the Risk of Cumulative Watershed Effects Resulting from Multiple Activities, USDA Forest Service (1993), does not render its Environmental Assessment inadequate. Cf. Committee to Preserve Boomer Lake Park v. Dept. of Transportation, 4 F.3d 1543, 1553 (10th Cir. 1993) (courts are not in a position to decide the propriety of competing methodologies, but should simply determine whether the challenged method had a rational basis and took into consideration the relevant factors).

NEPA requires that we review the record to ascertain whether the agency decision is founded on a reasoned evaluation of the relevant factors. Marsh v. Oregon Nat. Resources Council, 490 U.S. 360, 373-74 (1989). Once we are satisfied that an agency's exercise of discretion is truly informed, we must defer to that informed discretion. Id. at 377. It is true here, as it is in every case, that the agency could have discussed the

15

relevant environmental impacts in greater detail. Yet the EA in this case was hardly

superficial, and it was consistent with the fundamental purpose of an EA:

> An EA is essentially a more concise and less detailed version
> of an EIS. One of the principal purposes of an EA is to
> "[b]riefly provide sufficient evidence and analysis for
> determining whether to prepare an [EIS] or a [FONSI]." By
> conducting an EA, an agency considers environmental
> concerns yet reserves its resources for instances where a full
> EIS is appropriate. The EA must "include brief discussions of
> the need for the proposal, of alternatives..., of the
> environmental impacts of the proposed actions and
> alternatives, and a listing of agencies and persons consulted.
> [citations omitted]

Committee to Preserve Boomer Lake Park v. Dept. of Transportation, 4 F.3d 1543, 1554,

n. 9 (10th Cir. 1993). The record in this case shows the Forest Service made a reasoned

evaluation of the available information and its method was not arbitrary or capricious.[3]

Accordingly, we reject appellant's contention that the EA for this project failed to meet

the "hard look" requirement of NEPA.

Appellant's second main contention concerns the Forest Service's Finding of No

Significant Impact, or "FONSI." Under NEPA, an agency must go beyond the initial

environmental assessment and must perform an extensive environmental impact statement

for "major Federal actions significantly affecting the quality of the human environment."

---

[3] We note that the Environmental Assessment includes a monitoring plan designed to assess whether the proposed measures have an effect on overwinter survival of trout in several of the Boulder Top lakes and whether additional measures are needed to minimize sediment delivery. Aplt. App. at 0321-22.

16

42 U.S.C. § 4332(C). The Forest Service examined the factors relating to "significance" under 40 C.F.R. § 1508.27 and concluded this action would not significantly affect the quality of the human environment. Appellant argues this finding was erroneous because it failed to take into account certain factors, including the increased pressures from human impact on areas of Boulder Top that remain open to vehicle traffic and the environmental effect on Boulder Top as a unique geographic area.

"An agency's decision to issue a FONSI and not prepare an EIS is a factual determination which implicates agency expertise and accordingly, is reviewed under the deferential arbitrary and capricious standard of review." Committee to Preserve Boomer Lake Part v. Dept. of Transportation, 4 F.3d 1543, 1555 (10th Cir. 1993). "In our review, we 'must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.' This inquiry must 'be searching and careful,' but 'the ultimate standard of review is a narrow one.'" Id. (citing Marsh v. Oregon Nat. Resources Council, 490 U.S. 360, 378 (1989)).

The regulations implementing NEPA direct agencies to consider all effects on the human environment, both direct and indirect, in determining whether an Environmental Impact Statement is required. 40 C.F.R. § 1508.8. The "human environment" includes "the natural and physical environment and the relationship of people with that environment." 40 C.F.R. § 1508.14. In determining whether the human environment is "significantly" affected, the agency must examine both the context and intensity of the

17

impact from the proposed action. 40 C.F.R. § 1508.27.

Under these standards, we cannot say that the FONSI in this case was arbitrary and capricious. Contrary to appellant's argument, the record indicates the Forest Service in fact assessed all of the relevant factors. The EA contains an extensive discussion of the effects of the action, including the anticipated impact on recreational opportunities, soils and watersheds, fisheries, and transportation. It included an in-depth assessment of the direct and indirect effects on camping, fishing, hiking, horseback riding, hunting, cross-country skiing and wood gathering, among others, as well as the cumulative effects thereof. The Forest Service specifically recognized that the road closures would likely result in a large shift from vehicle-based activities to walk-in activities such as hiking, and also considered the possible increase in traffic density on roads that remained open or were improved. Aplt. App. at 0269-70. As the Forest Service noted, there was a difference of opinion as to whether the road closures would ultimately result in a net increase or decrease in access and use of Boulder Top. See Aplt. App. at 0528. The EA concluded that although some activities such as hiking would increase, the decrease in road access would cause a reduction in other activities such as dispersed camping, fishing, hunting and use of all-terrain vehicles. (The EA also noted that impacts from road construction and repair would lessen in view of the decreased road network.) The EA found that Alternative D would result in a large shift in the type of recreational opportunities available for users but an overall reduction in the number of actual

18

"Recreation Visitor Days" in the affected area. Aplt. App. at 0259. Additionally, in response to a specific concern from the UDWR as to whether the action would cause increased fishing pressure at Horseshoe Lake, the Forest Service considered that issue and decided that monitoring of the recreational use would be sufficient to guide any future decisions concerning access to that lake. Aplt. App. at 0527. Similarly, the Forest Service adequately considered the unique characteristics of Boulder Top in reaching its FONSI, as demonstrated by its discussion of the area's specific qualities throughout the EA's review of environmental impacts. Among other things, the FONSI noted that the action would not affect any historical or cultural resources, wild or scenic rivers, or ecologically critical areas; it was localized in nature and would not set a precedent for other projects; it would not adversely affect safety; it did not involve controversial or uncertain risks to the human environment; and it would not adversely affect any endangered or threatened plant or animal species. Aplt. App. at 0529-30. All things considered, the Forest Service had a plausible basis for finding the action would not significantly affect the human environment. In sum, we find that the Forest Service's decision was based on a consideration of the relevant factors, and no showing has been

19

made that the FONSI constituted "a clear error in judgment."  Cf. Committee to Preserve boomer Lake Park, 4 F.3d at 1556.

Conclusion.

The judgment of the district court is AFFIRMED.