### INTERNATIONAL SNOWMOBILE MANUFACTURERS ASSOCI-ATION, et. al., Plaintiffs,

### State of Wyoming, Plainiff–Intervenor,

### v.

### Gale NORTON, et. al., Defendants,

### Greater Yellowstone Coalition, et al., Defendant–Intervenors.

### No. 00–CV–229–B.

United States District Court, D. Wyoming.

Feb. 10, 2004.

Koll, David McCray, Edward Dougherty, Jamie McCray.

Keith Burron, Assoc. Legal Group, Cheyenne, WY, Lynda G. Cook, Cheyenne, WY, Patrick J. Crank, Cheyenne, WY, Thomas John Davidson, Cheyenne, WY, Jay A. Jerde, Wyoming Atty. Gen., Water & Natural Resources Div., Cheyenne, WY, for State of Wyoming.

Melinda D. Godwin, Andrea L. Richard, Rothgerber Johnson & Lyons, Cheyenne, WY, for Intern. Leisure Hosts, Ltd.

Andrew Emrich, Lauren Fischer, Martin J. LaLonde, Dept. of Justice, Environment & Natural Resources Div., Washington, DC, Thomas Roberts, U.S. Attorney's Office, Cheyenne, WY, for Director of Nat. Park Service, Regional Director of Intermountain Region, National Park Services, John D., Rockefeller, Superintendent, Yellowstone Nat. Park, U.S. Dept. of Interior Fish Wildlife and Parks Assist. Secretary, U.S. Dept. of Interior secretary.

Douglas Honnold, Timothy J. Preso, Earthjustice Legal Defense Fund, Bozeman, MT, Steve Jones, Wyoming Outdoor Counsil, Lander, WY, Alan B. Minier, State Bd. of Equalization, Cheyenne, WY, for Bluewater Network, Greater Yellowstone Coalition, National Parks Conservation Ass'n, Natural Resources Defense Council, Wilderness Society.

Gay Vanderpoel Woodhouse, Gay Woodhouse Law Office, Cheyenne, WY, for State of Montana.

Karen J. Budd-Falen, Franklin J. Falen, Brandon Lee Jensen, Budd-Falen Law offices, Cheyenne, WY, Douglas S. Burdin, William P. Horn, Barbara A. Miller, Birch Horton Bittner & Cherot, Washington, DC, for Blue Ribbon Coalition, Inc., Intern. Snowmobile Manufacturers Ass'n, Wyoming State Snowmobile Ass'n, Craig

**ORDER ON PLAINTIFF–INTERVENOR'S MOTION FOR TEMPORARY RESTRAINING ORDER and FOR PRELIMINARY INJUNCTION and PLAINTIFF ISMA'S MOTION FOR PRELIMINARY INJUNCTION**

BRIMMER, District Judge.

This matter is before the Court on Plaintiff–Intervenor State of Wyoming's

Motion for Temporary Restraining Order and For Preliminary Injunction and on Plaintiffs International Snowmobile Manufactures Association et. al.'s Motion for Preliminary Injunction. After reading the briefs, hearing oral argument, and being fully advised of the premises, the Court FINDS and ORDERS as follows:

### Statement of Parties and Jurisdiction

Plaintiff International Snowmobile Manufacturers Association ("ISMA") is an organization of snowmobile manufacturers established in 1995. Plaintiff Blue Ribbon Coalition, Inc. is an Idaho non-profit organization representing over 1,055 businesses and organizations with approximately 600,000 members nationwide. Plaintiff Wyoming State Snowmobile Association ("WSSA") was established 30 years ago and is based in Jackson, Wyoming. WSSA has approximately 20 member clubs with approximately 2,000 individual members. Plaintiffs David and Jamie McCray are long-time residents of West Yellowstone, Montana, and have guided tours and rentals available for viewing Yellowstone. Plaintiff Craig Kroll, resident of Jackson, Wyoming for fourteen years, owns Old Faithful Tours ("Old Faithful"), a small business located in Jackson, Wyoming. These Plaintiffs are collectively referred to as "ISMA Plaintiffs." Plaintiff–Intervenor State of Wyoming ("Wyoming") intervened in this matter based on socioeconomic and state sovereignty concerns. The State of Montana has recently asked this Court for permission to intervene as a Plaintiff in this case based on socioeconomic and other interests. The State of Montana did not participate in the briefing or oral arguments on either Plaintiff–Intervenor Wyoming's Motion for Temporary Restraining Order and for Preliminary Injunction or Plaintiff ISMA's Motion for Preliminary Injunction.

Defendant Gale Norton is sued in her official capacity as Secretary of the Department of the Interior; Defendant Joseph Dodderidge is sued in his official capacity as Acting Assistant Secretary for Fish, Wildlife and Park; Defendant Dennis Galvin is sued in his official capacity as Acting Director, U.S. National Park Service; Defendant Karen Wade is sued in her official capacity as Regional Director, Intermountain Region National Park Service; Defendant Michael Finley is sued in his official capacity as Superintendent, Yellowstone National Park; Defendant Jack Neckels is sued in his official capacity as Superintendent, John D. Rockefeller Memorial Parkway and Grand Teton National Park. These Defendants will be collectively referred to as "Federal Defendants."

The Greater Yellowstone Coalition, National Parks Conservation Association, The Wilderness Society, Blue Water Networks, and Natural Resources Defense Council (collectively referred to as "GYC Defendant–Intervenors") intervened in this matter as Defendants pursuant to this Court's Order Granting Motion to Intervene of February 9, 2001. The Greater Yellowstone Coalition is a conservation group dedicated to protecting the Greater Yellowstone ecosystem and has submitted briefs on behalf of the four other Defendant–Intervenors. Blue Water Networks withdrew from participation in this case pursuant to this Court's Order to Withdraw filed January 22, 2004.

The Court exercises federal question jurisdiction. 28 U.S.C. § 1331. Venue is proper. 28 U.S.C. § 1391(b),(e).

### Factual Background

This case ultimately stems from a 1997 lawsuit brought by the Fund for Animals against the National Park Service ("NPS") alleging that Yellowstone's winter use plan violated the National Environmental Policy Act ("NEPA") and the Endangered Species Act ("ESA"). A settlement agree-

ment was reached in 1997 in which the NPS agreed to prepare an Environmental Impact Statement ("EIS") addressing the issues of snowmobile use and trail grooming in Yellowstone. As a result of that litigation the NPS released a Draft EIS on winter use in the Yellowstone National Park, Grand Teton National Park and the John D. Rockefeller, Jr. Memorial Parkway (collectively referred to as "Yellowstone" or the "Parks"). The Draft EIS was released on September 29, 1999. The Draft EIS contained seven alternatives. Alternative A continued the existing historic winter use program of no restriction on snowmobile access. Alternative B, the NPS's preferred alternative, allowed continued use of snowmobiles, subject to new standards to reduce emissions and noise. Alternatives C through F allowed continued use of snowmobiles with various standards for reducing emissions and noise. Alternative G emphasized the use of clean and quiet over snow access to the parks using the technologies available today.

Between December 15, 1999, and March 12, 2000, the NPS prepared a revised version of Alternative G, which included an outright ban on all recreational snowmobile use in the Parks, restricted access to the Parks solely to NPS operated snowcoaches, and provided for additional road closures.

In October 2000, the NPS published the Final EIS for winter use in Yellowstone. The Final EIS was published in its entirety on the internet on October 10, 2000, however, notice of the availability of the Final EIS was not published in the Federal Register until October 31, 2000. *See* Notice, Winter Use Plans, Final EIS, 65 Fed.Reg. 64986 (October 31, 2000). The Final EIS made Alternative G the preferred alternative, this alternative called for a ban on snowmobiles in the Park and replaced snowmobile use exclusively with NPS operated snowcoaches. After the

publication of the Final EIS the public was given until October 31, 2000, to comment. On November 22, 2000 the NPS issued its Record of Decision ("2000 ROD"), adopting the Final EIS preferred alternative, which would eliminate snowmobile use in the Parks beginning in the 2002–2003 season and cutting snowmobile use by 50% in the 2001–2002 season. *See* Record of Decision, Winter Use Plans, 65 Fed.Reg. 80,-908 (November 22, 2000).

On December 18, 2000 the NPS published the Proposed Rule for implementing a ban on snowmobile use in the Parks. *See* Proposed Rule, 65 Fed.Reg. 79024–34 (December 18, 2000). The period for public comment was open until January 17, 2001. Then, on January 18, 2001, the last day of the Clinton Administration, the final rule ("2001 Snowcoach Rule") was issued, implementing the provisions of the 2000 ROD. *See* Snowcoach Rule, 66 Fed.Reg. 7260, 7268 (January 22, 2001).

### *Procedural Background*

On December 6, 2000, ISMA along with other interested parties filed suit in this Court challenging the 2000 Final EIS, 2000 ROD, and 2001 Snowcoach Rule. The State of Wyoming intervened as a plaintiff in the action, based on its interest in protecting the citizens of Wyoming. The Greater Yellowstone Coalition, National Parks Conservation Association, The Wilderness Society, Blue Water Networks, and Natural Resources Defense Council intervened as defendants to this action.

In June 2001, ISMA, Wyoming and the Federal Defendants entered into a Settlement Agreement ("2001 Settlement Agreement"). The NPS agreed to prepare a supplemental EIS, taking into consideration new snowmobile technologies not included in the 2000 Final EIS. At the request of the parties, this Court stayed the

litigation pending completion of the supplemental EIS process.

In November 2002, the NPS issued a rule postponing the implementation of the 2001 Snowcoach Rule until the NPS completed the supplemental EIS (the "2002 Rule"). *See* Final Rule, 67 Fed.Reg. 69,-473 (November 18, 2002). The 2002 Rule allowed unlimited snowmobile access for the 2002–2003 snowmobile season, but provided limited daily entries of snowmobiles during the 2003–2004 season to 493 snowmobile entries per day in Yellowstone and a total of 543 snowmobiles entries per day in the Parks.

The NPS evaluated new research showing dramatic decreases in snowmobile emissions offered by new 4–stroke snowmobiles. These new 4–stroke snowmobiles offer decreased hydrocarbon levels of more than 90%, reduced carbon emissions of more than 70% and decreased sound levels of approximately 50%. After considering these new technologies, the NPS issued a Final EIS adopting a new alternative which would allow continued snowmobile access to the Parks, subject to certain limitations on emissions reductions and daily entries to the Parks. The NPS published the ROD adopting this alternative in March 2003.

On December 11,2003 the NPS issued its final rule ("2003 Final Rule") allowing 950 snowmobiles a day in Yellowstone and a total of 1,140 snowmobiles a day in the Parks. *See* Final Rule, 68 Fed.Reg. 238 (December 11, 2003). The 2003 Final Rule required four stroke engines on eighty percent of the snowmobiles entering the National Parks.

Before the NPS completed the Final EIS, the Fund for Animals and the Greater Yellowstone Coalition had filed two lawsuits challenging the 2003 Further Delay Rule, the 2003 Final EIS, the March 2003 ROD and the 2003 Final Rule in the United States District Court for the District of Columbia ("D.C. District Court"). ISMA and Wyoming intervened in these actions. Both ISMA and the NPS filed motions to transfer the case from the D.C. District Court to the Wyoming District Court because of the potential overlap in the issues between the case currently pending in United States District Court for the District of Wyoming ("Wyoming District Court") and the cases before the D.C. District Court. The D.C. District Court consolidated the two cases, but denied the motions to transfer, finding that:

> [T]he issues presented in this case are different from those raised by the case still pending before the U.S. District Court for the District of Wyoming. Different agency documents and decisions are being challenged in each case, each of which must be reviewed with reference to its particular administrative record. The Wyoming case involves a challenge to the 2000 EIS, the November 2000 ROD, and the January 2001 final implementing regulations. These documents, and their attendant administrative records, are entirely distinct from those challenged in these actions, which are the November 20, 2003 "Further Delay Rule," the 2003 SEIS, and the March 2003 ROD, each of which was based on a discrete administrative record.

(Order of September 15, 2003 at p. 9, Judge Sullivan).

After a hearing on November 20, 2003, and another on December 15, 2003, the D.C. District Court issued a Judgment and Memorandum Opinion on December 16, 2003, only four days after the publication of the 2003 Final Rule, vacating the March 2003 Supplemental EIS, the 2003 ROD and the 2003 Final Rule. The D.C. District Court remanded the March 2003 Supplemental EIS, the 2003 ROD and the December 11, 2003, Final Rule to the NPS

for further proceedings and ordered the 2001 Snowcoach Rule, as modified by the 2002 Rule to remain in effect until further order of the Court.[1]

Wyoming and ISMA requested a stay of the D.C. District Court decision in the D.C. District Court, then in the D.C. Circuit Court of Appeals, both of these requests were denied. An appeal of the D.C. District Court's Judgment and Memorandum Opinion of December 16, 2003 is currently pending in the D.C. Circuit Court of Appeals.

Because of the D.C. District Court ruling, the 2001 Snowcoach Rule was implemented for the first time on December 16, 2003. Once the 2001 Snowcoach Rule was in effect for the first time, Wyoming requested this Court to reopen the pending case challenging the validity of the 2001 Snowcoach Rule. The case was reopened by this Court's Order Reopening Case, filed on December 31, 2001.

### *Jurisdiction*

■ The first issue for this Court to consider is whether it has the proper authority to issue a preliminary injunction in this matter. GYC Defendant–Intervenors argue that this Court does not have jurisdiction to grant an injunction because any injunction granted by this Court would directly conflict with the mandatory injunction issued by the D.C. District Court in its December 16, 2003, Judgment and Memorandum Opinion.

This Court does not believe that the D.C. District Court issued a mandatory injunction in its December 16, 2003, Judgment and Memorandum Opinion. The D.C. District Court's Judgment and Memorandum Opinion ruled on cross motions for summary judgment and found the 2003 Rule, the 2003 Final EIS, and 2003 ROD

invalid. After invalidating the 2003 Rule, the D.C. District Court replaced the 2003 Rule with the 2001 Snowcoach Rule as modified by the 2002 Rule.

This Court wants to make clear that the issue in this case is not the validity or the wisdom of the D.C. District Court's December 16, 2003, Judgment and Memorandum Opinion. The issue in this case is the validity of the 2001 Snowcoach Rule, a matter over which this Court has had jurisdiction since December 6, 2000. These two issues are separate and distinct and there are no issues of judicial comity presented by this Court deciding the validity of the 2001 Snowcoach Rule. As the D.C. District Court itself pointed out, "[t]his doctrine [of federal comity] has no application unless an identical complaint is filed in two different federal courts, which no one contends is the case here. Furthermore, . . . the federal comity rule is a discretionary doctrine." (Order of September 15, 2003 at p. 11, Judge Sullivan) (citations omitted).

The D.C. District Court was aware of the pending litigation in this Court over the validity of the 2001 Snowcoach Rule, but still asserted jurisdiction over the issue of the 2003 Rule. The D.C. District Court itself felt the issues of the validity of the 2003 Rule and the validity of the 2001 Snowcoach Rule were separate and distinct.

The case in this Court was stayed pending completion of the terms in the 2001 Settlement Agreement. However, the terms of the 2001 Settlement Agreement between the Federal Defendants, ISMA Plaintiffs and Wyoming were never fully completed and therefore this Court retains jurisdiction over the issue of the validity of the 2001 Snowcoach rule and has the prop-

---

1. The 2001 Snowcoach Rule provided a 50% reduction of snowmobiles for the 2001–2002 season and a complete ban in the 2002–2003 season. The 2002 Rule provided for implementing the phase-out and ban by one season.

er authority to grant a preliminary injunction in this matter.

### Standard of Review

■ Whether or not to grant preliminary injunctive relief is within the sound discretion of the district court. *Tri–State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 805 F.2d 351, 354 (10th Cir.1986). In determining whether to grant a preliminary injunction the Tenth Circuit has stated that:

> The main purpose of a preliminary injunction is simply to preserve the status quo pending the outcome of the case. In issuing a preliminary injunction, a court is primarily attempting to preserve the power to render a meaningful decision on the merits. Thus, this court must determine whether, in the interests of effective justice, a preliminary injunction should issue in the present case.

*Id.* at 355.

■ In order for a party to obtain a preliminary injunction, the requesting party must show: "(1) a substantial likelihood of prevailing on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the preliminary injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest." *Federal Lands Legal Consortium ex rel. Robart Estate v. U.S.*, 195 F.3d 1190, 1194 (10th Cir.1999). "As a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal." *SCFC ILC, Inc. v. Visa USA. Inc.*, 936 F.2d 1096, 1099 (10th Cir. 1991).

The Tenth Circuit has adopted a modified standard for the requirement of likelihood of success on the merits:

> When the other three requirements for a preliminary injunction are satisfied, "it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, ·substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation."

*Otero Savings & Loan Asso. v. Fed. Reserve Bank*, 665 F.2d 275 (10th Cir.1981) (citations omitted).

■ However, when granting a preliminary injunction there are three types of injunctions which are disfavored and require an even heavier burden of proof that the four factors weigh "heavily and compellingly" in favor of the party seeking an injunction. *SCFC,* 936 F.2d at 1098–99. Injunctions which require a heavier burden of proof are "(1) a preliminary injunction that disturbs the status quo; (2) a preliminary injunction that is mandatory as opposed to prohibitory; and (3) a preliminary injunction that affords the movant substantially all the relief he may recover at the conclusion of a full trial on the merits." *Id.*

■ When the injunction at issue falls into one of the categories of a disfavored injunction "the movant will ordinarily find it difficult to meet its heavy burden of showing that the four factors, on balance, weigh heavily and compellingly in its favor, without showing a substantial likelihood of success on the merits." *Id.* at 1101.

### Analysis

#### I. Irreparable Injury

■ "In federal courts, the moving party must show irreparable injury in order to obtain a preliminary injunction." *Tri–State Generation,* 805 F.2d at 355 (internal citations omitted). Generally injury will not be considered irreparable if monetary damages would be adequate to provide relief to the party seeking the injunction after a trial on the merits. *Id.* "Thus, [the movant] must show not only that it is

injured by the failure to issue the preliminary injunction, but also that damages are not adequate to compensate that injury." *Id.*

Wyoming claims that the dramatic decrease in daily entries combined with public confusion over the status of snowmobile use in the Parks will cause millions of lost dollars in labor, income and tax revenue and that these losses are unrecoverable and cannot be compensated if Wyoming ultimately prevails on the merits in this case. Wyoming points to the fact that Wyoming outfitters invested $1.2 million to convert their fleets to new four-stroke snowmobiles, relying on the 2003 Rule. These outfitters have also booked reservations, taken deposits and contracted with employees for the 2003–2004 snowmobile season.

Wyoming also claims that the 2001 Snowcoach Rule, as modified by the 2002 Rule, infringes on Wyoming's sovereignty in two distinct ways. First, the reduction of snowmobile entries adversely affects the ability of Wyoming to manage the Wyoming Trails Program. Second, the Snowcoach Rule adversely affects the Wyoming Game and Fish Department's ability to manage fish populations in Jackson Lake in Grand Teton National Park. Wyoming believes that these infringements on state sovereignty constitute irreparable harm.

ISMA Plaintiffs argue that winter recreation businesses are incurring and will continue to incur catastrophic losses. Some businesses may even face bankruptcy as a result of the 2001 Snowcoach Rule. Evidence at the hearing showed that many business are also losing the goodwill they have developed over several years of business. Much of this economic loss stems from the timing of the D.C. District Court ruling, issued the night before the opening of the snowmobile season in the Parks. While much harm has already been suffered by the businesses and concession-

aires in the Yellowstone area, it appears that these economic losses will continue, perhaps even forcing some businesses into bankruptcy, if injunctive relief is not granted.

■ "A threat to trade or business viability may constitute irreparable harm." *Tri–State Generation,* 805 F.2d at 355. This Court is not just concerned with harm caused to a single business, but to a whole group of businesses which supply lodging, dining, gas, and other services to snowmobilers in the Parks. These businesses relied on the NPS's 2003 Rule for making reservations, taking deposits, hiring employees, and making many other business decisions. Then on the night before the snowmobile season was to begin, these businesses learned that they would not be regulated by the 2003 Rule, but rather the 2001 Snowcoach Rule as modified by the 2002 Rule. They did not have time to prepare for the ramifications of the 2001 Snowcoach Rule and the effects it would have on their businesses for the 2003–2004 snowmobile season. While these businesses may have already suffered irreparable injury, an injunction seems to be the only way to salvage even a part of the season for many of these businesses. "Loss of customers, loss of goodwill, and threats to a business' viability can constitute irreparable harm." *Zurn Constructors, Inc. v. B.F. Goodrich Co.,* 685 F.Supp. 1172, 1181 (D.Kan.1988). Wyoming and ISMA Plaintiffs have adequately shown that without the preliminary injunction they will suffer irreparable harm. The irreparable injury factor weighs heavily in favor of granting the requested preliminary injunction.

## II. Balance of Harm

■ For Wyoming and ISMA Plaintiffs to be entitled to a preliminary injunction they must show that "the threatened

injury to the movant outweighs the injury to the other party under the preliminary injunction." *Kikumura v. Hurley*, 242 F.3d 950, 955 (10th Cir.2001). Wyoming and ISMA Plaintiffs argue that GYC Defendant–Intervenors will not be harmed because under the 2001/2002 Rules snowmobiles are still allowed in the Parks and the relief ultimately sought by Defendant–Intervenors is a complete ban on snowmobiles in the Parks. Additionally, Wyoming and ISMA Plaintiffs assert that the harm of visitors having to wait a season or two to visit the Park while the case is decided does not fall into the same league of injury as the harm suffered by the businesses in the Parks and members of the public who will lose out on paid for vacations. ISMA Plaintiffs additionally assert that the Supplemental EIS demonstrates snowmobiling does not irreparably harm air quality or adversely impact the wildlife.

GYC Defendant–Intervenors argue that "snowmobiles disturb wildlife, shatter the natural quiet, and degrade the air quality in Yellowstone." (Defendant–Intervenors Opp. to Plaintiff–Intervenors Mot. Temp. Restraining Order and Prelim. Inj. at p. 8)(citing 66 Fed.Reg. at 7,261–62). GYC Defendant–Intervenors point to Park Rangers wearing respirators at the park entrances. GYC argues that there are real injuries suffered by the employees and visitors to the Park if increased snowmobile use is allowed in the Park.

In balancing the harms suffered by the parties in this case it appears that if this injunction is not granted, several businesses will continue to suffer extreme financial distress. These businesses are losing the goodwill of customers that they have built up over years of service and some businesses may even face bankruptcy. Testimony from various business owners indicated that many people will make reservations for the 2004–2005 season during the 2003–2004 season and that confu-

sion over the status of snowmobiling is hurting prospects for the 2004–2005 snowmobile season.

Balanced against those injuries are the alleged harm that the GYC Defendant–Intevenors claim will be suffered by employees and visitors to the Park if increased snowmobiling is allowed. Under the current 2001/2002 Rules there are no restrictions on the kinds of snowmobiles allowed into the Parks. There has been no showing by GYC Defendant–Intevenors of the current health risks in the Park under the 2001/2002 Rules, only the assertion that increased snowmobile use will increase the adverse health effects to visitors and employees of the Parks. It is probably true that increased snowmobile use may increase the noise and air pollution in the Parks, especially at the entrances where there are numerous snowmobiles grouped together awaiting entrance into the Parks. However, this Court believes that the harm suffered by Wyoming and ISMA Plaintiffs is far greater than that suffered by GYC Defendant–Intevenors in continuing the Winter Use Plan that has been in effect in the Park for decades, and that with the advent of four-stroke snowmobiles the public health issues and the respiratory problems of Park Rangers will be very much diminished by this new technology, as well as by better management of the entrance process by the NPS.

In considering the balance of harm, this Court believes that the harm to the businesses and citizens of not granting this injunction, far outweighs the harm to GYC Defendant–Intevenors in granting the injunction.

### III. Public Interest

■ "A movant also has the burden of demonstrating that the injunction, if issued, is not adverse to the public interest."

*Heideman, et. al. v. S. Salt Lake City,* 348 F.3d 1182 (10th Cir.2003). Wyoming and ISMA Plaintiffs argue that public policy favors protecting local economies, preserving public access to the National Parks and preserving the public process for agency decision making. GYC Defendant–Intevenors assert that public policy is in favor of protecting public health and the integrity of our first National Park.

The decision of the D.C. District Court and the sudden judicial implementation of the old Clinton administration 2001 Snowcoach Rule has led to a great deal of confusion in the general public about the accessibility of the Parks. Additionally, the 2001 Snowcoach Rule was sprung on the business owners and concessionaires the night before the beginning of the 2003–2004 snowmobile season. Public interest is served by protecting the business owners and concessionaires who relied on the NPS's proposed regulations. There is also a public interest in insuring the proper rulemaking process is followed, especially in cases such as this, where so many different interests are affected by the Rule in question. The 2001 Snowcoach Rule has enormous impacts on the winter use of the Parks. Effects from the 2001 Snowcoach Rule are felt by a large portion of the population, from local businesses and concessionaires, to citizens all over the country who visit the Parks throughout the winter. A single Eastern district judge shouldn't have the unlimited power to impose the old 2001 rule on the public and the business community, any more than a single Western district judge should have the power to opt for a different rule. Rather, these issues should be left in the care of the NPS, the administrative agency into whose hands the public has entrusted this matter. Because of the manner in which the 2001 Snowcoach Rule was thrust upon businesses, concessionaires, the States of Wyoming, Montana, and Idaho, and the general public, through a judicial

decision released the night before the snowmobile season was to begin, there is a great public interest in granting a preliminary injunction against enforcement of the 2001 Rule until the validity of the Rule can be determined.

## IV. Likelihood of Success on the Merits

 The final issue for the Court to consider is the likelihood of success on the merits. In the Tenth Circuit, if the party seeking a preliminary injunction has proved its burden on the three factors listed above, then they may meet the likelihood of success requirement "by showing that questions going to the merits are so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation." *Fed. Lands Legal Consortium v. United States,* 195 F.3d 1190, 1195 (10th Cir.1999).

The underlying issue in this case is the validity of the 2001 Snowcoach Rule. Issues arising from the promulgation of this rule are serious and have a tremendous impact on a wide variety of people, including, business owners, concessioners, visitors to the Park, the states of Wyoming, Montana, and Idaho, and many others. The record shows that Wyoming and ISMA Plaintiffs have raised serious questions concerning the validity of the 2001 Rule, questions which deserve further investigation and a full review of the administrative record.

For these reasons the Court feels that Wyoming and ISMA Plaintiffs have met the modified requirement for showing a likelihood of success on the merits. However, this Court will also discuss the substantial likelihood of success on the merits, in the event that on review an appellate court should find that the modified standard is not appropriate in this case be-

cause the relief provided by the preliminary injunction is mandatory or disturbs the status quo.

## A. Wyoming and ISMA Plaintiffs' Likelihood of Success on the Merits

■ Judicial review of an agency's final action is governed by the Administrative Procedure Act ("APA"). See 5 U.S.C. §§ 701 to 706; *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). Under the APA, a federal court may set aside agency action if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). An agency decision is arbitrary or capricious if: (1) the agency entirely failed to consider an important aspect of the issue; (2) the agency offered an explanation for its decision that was counter to the evidence before it; (3) the agency relied on factors that Congress did not intend for it to consider; or (4) the agency's decision is so implausible that it could not be ascribed to the product of agency expertise. *Colo. Envtl. Coalition v. Dombeck*, 185 F.3d 1162, 1167 (10th Cir.1999).

■ In reviewing an agency action the court must "determine whether the Agencies: (1) acted within the scope of their authority, (2) complied with prescribed procedures, and (3) took action that was neither arbitrary and capricious, nor an abuse of discretion. Within this context, we will set aside the Agencies' factual determinations only if they are unsupported by substantial evidence." *Wyoming Farm Bureau Fed'n v. Babbitt*, 199 F.3d 1224, 1231 (10th Cir.2000) (citations omitted).

At this time the Administrative Record has not been fully developed and the parties have not had a chance to brief the issues addressing the merits of the underlying case with full cites to the administrative record. However, there are certain facts and circumstance that indicate a substantial likelihood of success on the merits in favor of Wyoming and ISMA Plaintiffs.

ISMA Plaintiffs claim that the 2001 Snowcoach Rule, the 2000 ROD, and the 2000 Final EIS are invalid because the NPS failed to take a "hard look" at the information relevant to its decision making, the NPS based its decision to ban snowmobiles on predetermined political motives, and the NPS failed to provide the public and cooperating agencies with meaningful participation.

### 1. Hard Look

ISMA Plaintiffs claim that the NPS failed to take a hard look at the environmental impacts of the alternatives and especially of the NPS's preferred alternative. The Draft EIS was released on September 29, 1999. The Draft EIS named Alternative B the NPS's preferred. alternative. Alternative B allowed continued use of snowmobiles in the Parks subject to new standards to reduce emissions and noise. Then sometime between the issuance of the September Draft EIS and the October 2000 Final EIS the NPS changed course and made Alternative G, the preferred alternative, which included an outright ban on all recreational snowmobiles use in the Parks and restricted access to the Parks to NPS operated snowcoaches.

■ ISMA Plaintiffs assert that the NPS failed to sufficiently analyze the environmental impacts of this alternative. ISMA Plaintiffs claim that the hard data relied on by the NPS in making this decision were two sound studies and one emissions study. The ISMA Plaintiffs argue that the NPS failed to consider the safety, reliability and economic feasibility of the use of snowcoaches. "The role of the courts in reviewing compliance with NEPA is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and

that its decision is not arbitrary and capricious." *Utah Shared Access Alliance v. United States Forest Serv.*, 288 F.3d 1205, 1208 (10th Cir.2002) (citations and quotation marks omitted).

The NPS chose a snowcoach-only option without adequately considering the environmental or safety aspects of snowcoaches in the Parks. While this fact alone may not cause the 2001 Snowcoach Rule to be found invalid it does indicate the inadequate consideration given this decision by the NPS. In fact, a recent NPS press release shows that it has found four-stroke snowmobiles to be less polluting than anticipated.

### 2. Prejudged Political Decision

ISMA Plaintiffs additionally allege that the decision to ban snowmobiles in the Parks was a politically prejudged decision. In April 2002, Assistant Secretary Barry issued a memorandum to the NPS directing them to prohibit snowmobile access in national park units. (ISMA's Mot. Prelim. Inj. Ex. 8). This memorandum came after the September 29, 1999 Draft EIS, which concluded that snowmobile access was consistent with all applicable laws.

This Court believes that the record establishes a prejudged political conclusion to ban snowmobiles in the Parks. This prejudged conclusion "diminishes the deference owed to the Federal Defendants." See *Davis v. Mineta*, 302 F.3d 1104, 1112 (10th Cir.2002)(diminished deference owed to the federal defendants in review of their decision to issue a FONSI rather than an EIS). The prejudged political conclusion reached by the 2000 Final EIS and the lack of a hard look at the environmental impacts of snowcoaches in the Parks, leads to a substantial likelihood that the October 2000, Final EIS, December 22, 2000, ROD and the 2001 Snowcoach Rule could be ruled as arbitrary and capricious after a full review of the record.

### 3. NPS's Failure to Meet Obligations to Cooperating Agencies

ISMA Plaintiffs assert that the NPS failed to involve or consider input from cooperating agencies. ISMA Plaintiffs claim that the cooperating agencies were essentially cut out of the rulemaking process by the NPS. Without explanation the NPS changed its proposed action from allowing snowmobiles to a complete ban of snowmobiles in the Parks. The NPS then gave the cooperating agencies a very short time to comment on this drastic change. It appears that the cooperating agencies were made aware of the decision to make Alternative G the preferred alternative on March 13, 2000, and were asked for a formal response by March 24, 2000. (ISMA's Mot. Prelim. Inj. Exh. 7). In a letter dated March 22, 2000, the then Governors of Montana, Idaho and Wyoming, protested the new preferred alternative and requested additional time to respond, which was refused. (Id.). In that letter, the Governors of the three states most impacted by the NPS's decision asked for additional information from the NPS on how it had made its decision, stating that "the NPS has provided us with little new information upon which you have apparently based this decision." (Id.).

██ The purpose of having cooperating agencies is to emphasize agency cooperation early in the NEPA process. 40 C.F.R. § 1501.6 (2004). Federal agencies are required to invite the participation of impacted states and provide them with an opportunity for participation in preparing an EIS. 40 C.F.R. § 1501.7 (2004). "When a federal agency is required to invite the participation of other governmental entities and allocate responsibilities to those governmental entities, that participation and delegation of duty must be meaningful." *Wyoming v. USDA*, 277 F.Supp.2d 1197, 1219 (D.Wyo.2003). It appears clear

that cooperating agencies were essentially excluded from the decision-making process, in violation of NEPA.

### 4. The NPS Deprived the Public of Meaningful Participation in the 2000 FEIS and ROD Process.

ISMA Plaintiffs claim that the NPS denied the public meaningful participation in the development of the 2000 Final EIS and ROD. According to the GYC Defendant–Intevenors, the NPS published the Final EIS in its entirety on the internet on October 10, 2000. (GYC's Opp. to ISMA's Mot. Prelim. Inj., at p. 4). However, the notice of availability of the 2000 Final EIS was not published in the Federal Register until October 31, 2000. See 65 Fed.Reg. 64986. The public was then given until October 31, 2000, the same day, to provide comments on the changes. Id. On December 18, 2000, the NPS issued its proposed regulations for implementing the snowcoach only alternative. See 65 Fed.Reg. 79024–34 (December 18, 2000). The NPS gave the public until January 17, 2001 to comment. On January 18, 2001, the last day of the Clinton administration and only one day after the close of the comment period, the final regulations implementing the snowcoach rule were signed. See 66 Fed.Reg. 7260 (January 22, 2001). Some 5,000 comments were received on the proposed regulations, many on the last day. (ISMA's Mot. Prelim. Inj., at p. 17). Given the rushed nature of this procedure and the short comment periods, this Court questions the NPS's ability to adequately review and consider all the submitted comments. The rushed nature of the NPS's actions indicates both a violation of the NEPA process and an arbitrary and capricious, predetermined decision on the part of the NPS in promulgating the 2000 Final EIS and ROD and in the implementation of the 2001 Snowcoach Rule.

### 5. The 2000 Final EIS and ROD Violate the APA

Finally, ISMA Plaintiffs claim that the 2000 Final EIS and ROD violated the APA. "The APA's arbitrary and capricious standard is a deferential one; administrative determinations may be set aside only for substantial procedural or substantive reasons, and the court cannot substitute its judgment for that of the agency." Utahns v. United States DOT, 305 F.3d 1152, 1164 (10th Cir.2002). "Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." Motor Vehicle Mfrs. Assoc. v. State Farm Mut. Auto. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (citations and quotation marks omitted).

In the 2000 Final EIS, the NPS reversed not only its position in the 1999 Draft EIS that concluded continued snowmobile use in the Parks was acceptable, but also forty years of snowmobile access to the Parks. The Final EIS never explained its sudden determination that snowmobiles should be banned from the Parks. In less than a year, from March 2000 to January 18, 2001, the NPS had gone from a history of unlimited snowmobile access to a complete ban. The NPS never fully explained the change from unlimited access, to the Draft EIS proposal of more limited access, to the Final EIS proposal of a complete ban on snowmobiles.

ISMA Plaintiffs also argue that the NPS's failure to provide public participation violated the APA. The APA requires that interested persons have the opportunity to participate in the rule making process.[2] By giving limited comment

---

2. 5 U.S.C. § 553(c) provides:

After notice required by this section, the

periods and providing the final implementing regulations the day after the comment period has ended, the NPS has failed to provide meaningful participation in the rulemaking process to the public under the APA.

For all of the above reasons this Court feels that ISMA Plaintiffs and Wyoming have a substantial likelihood of success on the merits in their challenge of the validity of the 2000 Final EIS, the 2000 ROD and the 2001 Snowcoach Rule. This Court believes that the facts and law show that the four factors for granting a preliminary injunction weigh heavily in favor of Wyoming and ISMA and this Court will grant a preliminary injunction.

## V. Appropriate Relief for the Preliminary Injunction.

One of the most difficult issues in this case is determining the proper form of injunctive relief. Wyoming has asked the Court to either require the NPS to follow pre–2001 winter use plan or for the Court to use its equitable powers to require the NPS to follow the winter use requirement set forth in the Final Rule issued by the NPS on December 11, 2003. It is clear that this Court cannot require the NPS to follow the 2003 Rule issued by the NPS on December 11, 2003. The 2003 Rule was reversed by the D.C. District Court and to reinstate that rule would be in direct contravention of the D.C. District Court's ruling of December 16, 2003, and this Court refuses to take such action. ISMA Plaintiffs have asked the Court to prohibit the NPS from implementing the 2001 Snowcoach Rule and therefore maintaining the status quo through the pendency of this litigation.

The Tenth Circuit has described the status quo as "the last uncontested status between the parties which preceded the controversy until the outcome of the final hearing." *SCFC*, 936 F.2d at 1100 n. 8 (citation and quotation marks omitted). The last uncontested status in this case, appears to be the pre–2001 winter use plan for the Park, which was essentially no regulation. GYC Defendant–Intevenors argue that "the old winter use 'program' of unrestricted snowmobile use illegally impairs Park resources in violation of the National Park Organic Act." (GYC's Opp. to ISMA's Mot. Prelim. Inj., at p. 9). This Court agrees that it cannot grant relief which would violate the National Park Organic Act.

As this Court is not an expert on the proper regulations for snowmobile use in the Parks, this Court will defer to the experts, the NPS, to create a Winter Use Plan for the remainder of the 2003–2004 season, which will be fair to all parties.

### *Conclusion*

Wyoming and ISMA Plaintiffs have satisfied their burden of showing that it is in the interests of justice to issue a preliminary injunction. Wyoming and ISMA Plaintiffs have demonstrated irreparable harm if the injunction does not issue. This harm includes the significant financial loss that will be sustained by businesses and concessionaires, the loss of goodwill and the potential that some businesses may go bankrupt if the injunction is not issued. These are losses that cannot be compensated if Wyoming and ISMA Plaintiffs prevail on the merits in this case. Any harm from issuing the injunction is less than the

agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose.

harm which would occur if the injunction is not granted. The public interest, in ending public confusion and assisting businesses that relied on the rulemaking process of the NPS favor issuance of the injunction. Finally, the underlying merits involve questions of law that are serious, substantial, difficult, and doubtful and are fair grounds for litigation. Additionally, ISMA Plaintiffs and Wyoming have demonstrated that they have a substantial likelihood of success on the merits. Therefore, the injunction in this case should issue and the Court directs the NPS to implement winter use rules for the remainder of the 2003–2004 season, in accordance to this decision, which will be fair to all parties.

For all the aforementioned reasons, Plaintiff–Intervenor Wyoming and ISMA Plaintiffs' Motions for Preliminary Injunction are **GRANTED** and it is **HEREBY ORDERED** that, pending further order herein, the NPS be, and hereby is, temporarily restrained from enforcing the 2001 Snowcoach Rule in Yellowstone National Park, Grand Teton National Park and the John D. Rockefeller, Jr. Memorial Parkway, that the NPS is hereby required forth with to promulgate temporary rules for this 2004 snowmobile season that will be fair and equitable to snowmobile owners and users, to the business community, and to the environmental interests, such as the Greater Yellowstone Coalition, by limiting snowmobile use to four-stroke machines, and to all other interests public and private, of which the NPS is aware.